**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

                v.

JAMES LLOYD, AKA James V.
Lloyd, Jr., AKA James Vernon
Lloyd,
          *Defendant-Appellant*.

No. 12-50499

D.C. No.
2:11-cr-00542-
JFW-1

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

                v.

JAMES LLOYD, AKA James V.
Lloyd, Jr., AKA James Vernon
Lloyd,
          *Defendant-Appellant*.

No. 12-50500

D.C. No.
2:11-cr-00543-
JFW-3

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee*,

                    v.

PAUL BAKER, AKA Darwin Stanton
Baker, Jr., AKA Paul D. Baker,
AKA Paul Douglas Baker,
            *Defendant-Appellant*.

No. 12-50509

D.C. No.
2:11-cr-00543-
JFW-4

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee*,

                    v.

DAVID NELSON, AKA David Paul
Nelson,
            *Defendant-Appellant*.

No. 12-50514

D.C. No.
2:11-cr-00543-
JFW-11

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee*,

                    v.

ALBERT GREENHOUSE, AKA Albert
Michael Greenhouse,
            *Defendant-Appellant*.

No. 12-50526

D.C. No.
2:11-cr-00543-
JFW-7

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ROBERT KESKEMETY,
*Defendant-Appellant*.

No. 12-50566

D.C. No.
2:11-cr-00542-
JFW-4

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted
July 8, 2014—Pasadena, California

Filed December 4, 2015

Before: Marsha S. Berzon and Richard R. Clifton, Circuit
Judges and Lee H. Rosenthal,[*] District Judge.

Opinion by Judge Rosenthal

---

[*] The Honorable Lee H. Rosenthal, District Judge for the U.S. District
Court for the Southern District of Texas, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed in part, reversed in part, vacated in part, and remanded in part in cases in which five defendants—who worked for telemarketing "boiler rooms" in California and Florida, soliciting investments in partnerships to finance the production and distribution of movies—appeal their convictions or sentences for selling unregistered securities.

James Lloyd pleaded guilty to two counts of wire fraud and Robert Keskemety to one count of mail fraud. The panel affirmed Lloyd's sentence, but concluded that Keskemety's sentence for managing the Florida telemarketing boiler room improperly included fraud losses from the California boiler room that Lloyd managed. The panel vacated Keskemety's sentence and remanded for resentencing.

The jury convicted both David Nelson and Paul Baker of one count of conspiracy to commit mail and wire fraud and to offer and sell unregistered securities, two counts of mail and wire fraud, and two counts of offering and selling unregistered securities. The panel reversed Nelson's conviction based on evidentiary errors—including improper admission of lay opinion testimony, Fed. R. Evid. 404(b) evidence, and an email containing hearsay statements. The panel affirmed Baker's conviction due to the overwhelming evidence against him, making the evidentiary errors harmless.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel vacated Baker's sentence and remanded for resentencing because the district court did not account for U.S.S.G. § 4A1.2(k), cmt. n.11, in calculating his criminal history score.

The panel found no error in Albert Greenhouse's sentence.

## COUNSEL

Edward M. Robinson (argued), Law Office of Edward M. Robinson, Torrance, California, for Defendant-Appellant James Lloyd.

John C. Lemon (argued), San Diego, California, for Defendant-Appellant Paul Baker.

Sean K. Kennedy and Kathryn A. Young (argued), Deputy Federal Public Defenders, Los Angeles, California, for Defendant-Appellant David Nelson.

Lawrence Jay Litman (argued), Los Angeles, California, for Defendant-Appellant Albert Greenhouse.

Russell S. Babcock (argued), Law Offices of Russell S. Babcock, San Diego, California, for Defendant-Appellant Robert Keskemety.

André Birotte, Jr., United States Attorney, Central District of California, Robert E. Dugdale, Chief, Criminal Division, Steven A. Cazares and Ellyn Marcus Linsday (argued), Assistant United States Attorneys, Los Angeles, California, for Plaintiff-Appellee.

**OPINION**

ROSENTHAL, District Judge:

Five defendants appeal their convictions or sentences for selling unregistered securities. The defendants worked for telemarketing "boiler rooms" in California and Florida, soliciting investments in partnerships to finance the production and distribution of movies. The defendants promised potential investors that the investments would return swift and large profits, with little to no risk. Approximately 650 individuals—including unsophisticated people who could not afford the financial loss—invested over $23 million. Most of the investors lost it all.

These appeals arise from two indictments issued in the Central District of California on June 15, 2011. The indictment in *United States v. Daniel Toll et al.*, No. 11-cr-543-JFW, charged James Lloyd, who managed a boiler room in Los Angeles, California; telemarketers Paul Baker, David Nelson, and Albert Greenhouse; and eight others, all of whom worked through a California boiler room to sell partnership units in three movies produced (or supposed to be produced) by Cinamour Entertainment, LLC. The indictment in *United States v. James Lloyd*, No. 11-cr-542-JFW, charged Lloyd, who left Cinamour to manage a different boiler room in California, and Robert Keskemety, who managed a Florida boiler room, along with seven others, for selling partnership units in two movies. These movies were produced by Q Media Assets LLC, a company owned by the same person who owned Cinamour. Both indictments charged conspiracy, mail fraud, wire fraud, and securities fraud between 2001 and 2009.

The two boiler room managers, James Lloyd and Robert Keskemety, were convicted after they pleaded guilty. They appeal only their sentences. Two Cinamour telemarketers working in California, David Nelson and Paul Baker, and Albert Greenhouse, a Cinamour telemarketer working in Florida, were tried together. Nelson and Baker appeal their convictions and sentences. The only issue in the Greenhouse appeal is the sentence. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

The number of defendants, the lengthy period involved, and the type of conduct made this a difficult case for any trial court to resolve. The record shows that the district judge competently and fairly resolved many of the innumerable issues that arose in trial and at sentencing. The points on which we disagree with the district judge raise issues that are both complex and close.

James Lloyd pleaded guilty to two counts of wire fraud and Robert Keskemety to one count of mail fraud. They appeal their sentences. We affirm Lloyd's sentence, but we conclude that Keskemety's sentence for managing the Florida telemarketing boiler room improperly included fraud losses from the California boiler room that Lloyd managed. We vacate Keskemety's sentence and remand for resentencing.

David Nelson and Paul Baker appeal both the convictions and sentences entered after the jury convicted each of one count of conspiracy to commit mail and wire fraud and to offer and sell unregistered securities, two counts each of mail and wire fraud, and two counts of offering and selling unregistered securities. We reverse Nelson's conviction based on evidentiary rulings, vacate the sentence, and remand. We affirm Baker's conviction due to the

overwhelming evidence against him, making the evidentiary errors harmless, but we vacate Baker's sentence and remand for resentencing because of an error in calculating the Guidelines sentence.

Finally, Albert Greenhouse appeals the sentence he received after the jury convicted him of two counts of offering and selling unregistered securities. We find no error, and we affirm.

## BACKGROUND

Glen Hartford, a film producer, founded Cinamour in 2000 to make and distribute independent films, and served as its chief executive officer and majority shareholder. Hartford used telemarketing to solicit money from individual investors to finance three movies: *Forbidden Warrior*, *From Mexico with Love*, and *Red Water 12*. These three movies are the basis of the *United States v. Toll* indictment.

Cinamour began raising money for *Forbidden Warrior* in 2001 out of a telemarketing boiler room in Los Angeles, California. Lloyd and Baker were involved in the *Forbidden Warrior* fundraising. That movie was released in 2005 directly to video distribution and made about $500,000, a commercial failure of large proportions.

From 2004 to 2007, Cinamour used telemarketing to solicit purchases of partnership units to finance *From Mexico With Love*. Cinamour raised approximately $14.2 million from 445 investors nationwide. *From Mexico With Love* grossed about $800,000 from a very limited theatrical release. The investors received no return on the money they sent.

Lloyd, Baker, and Greenhouse were involved in soliciting investments in *From Mexico With Love.*

In 2007, Cinamour began telemarketing sales of partnership units in *Red Water*. Cinamour raised approximately $2.8 million from approximately 100 victims nationwide but spent only $23,000 on making the movie. The investors lost everything. Baker and Nelson were involved in soliciting the investments in *Red Water*.

In 2009, after an undercover investigation, the FBI raided Cinamour's Los Angeles offices. Hartford committed suicide days after the raid.

The indictment in *United States v. Lloyd* arose from telemarketed investments in two movies written, directed, and produced by a former Central Intelligence Agency officer, Michael D. Sellers. Sellers retained Joel Lee Craft, Jr., founder and chief executive officer of American Information Strategies, Inc., to help raise capital for the films, *Eye of the Dolphin* and *Way of the Dolphin*. Sellers worked with Craft to set up telemarketing boiler rooms, hiring Keskemety in Florida, and later, Lloyd in California, to manage them.

In 2002, Sellers recruited Keskemety to establish and manage the Florida telemarketing office. The goal was to raise money for the two *Dolphin* movies. In 2004, Keskemety began soliciting investments for *Eye of the Dolphin*. Sellers asked Craft to introduce him to other potential boiler-room managers. Through Craft, Sellers met Lloyd and hired him in 2007 to move from managing the Cinamour telemarketing office in Los Angeles to managing an office in the same city to solicit investments in partnership units to finance Sellers's films. Keskemety and Lloyd hired

and paid the other telemarketers to raise money for the *Dolphin* films.

When Lloyd began managing the Los Angeles boiler room for Sellers, he had been working for Cinamour for over four years soliciting money for *Forbidden Warrior* and *From Mexico With Love*.   He brought the same marketing techniques to selling partnership units in *Eye of the Dolphin* and *Way of the Dolphin*.  The California and Florida boiler rooms together raised $9.6 million from 264 investors for the two *Dolphin* movies.  Both movies failed.  The investors in the first movie, as a group, received only $370,656 of their initial investment.  The investors in the second movie lost everything.

The boiler rooms were similar.  Less experienced telemarketers served as "fronters," cold-calling potential investors from lists of leads and reading from scripts to pitch the investments.   The scripts included assurances to prospective investors of quick and large profits with little to no risk.  These promises, and the details supporting them, were false.  If the cold-calls led to expressions of interest, "closers"—more experienced telemarketers—would follow up and try to get signed investment documents and a check to close the deal.  "Reloaders" would induce some of those who had already invested to put in more.

Many of the defendants had multiple roles, but each of the appellants worked as closers some of the time.  Lloyd helped close investments in *Forbidden Warrior* and *From Mexico with Love*.  Baker helped close investments in *Forbidden Warrior*, *From Mexico with Love*, and *Red Water*.  Nelson helped close investments in *Red Water*.  Greenhouse helped close investments in *From Mexico with Love*.  Lloyd and

Keskemety were closers for *Eye of the Dolphin* and *Way of the Dolphin*.

Lloyd, Baker, Nelson, and Greenhouse also worked as "reloaders" on the Cinamour films, targeting those who had already invested to persuade them to invest more. Reloaders participated in conference calls with these investors. The calls included telemarketers who pretended to be investors and enthusiastically agreed to commit more money. Lloyd also worked as a reloader on the two *Dolphin* films, but Keskemety did not.

Most of the defendants asserted that they believed the leads they cold-called and persuaded to invest were suitable and accredited individuals who were sophisticated and financially able to risk losing the money. The trial testimony from and about the investors, as well as the information in the presentence reports, tell a different story. Many of the investors had no significant experience in investing and few had significant liquid assets. Many had or were about to retire. At the trial, some of the investors testified that they had told the fronters, the closers, and the reloaders about their limited investment experience, their limited resources, and their life situations. The investors repeatedly testified about the defendants' assurances that the investments were risk free and would be returned with a profit within a short period. The investors briefly testified about the effects on them of losing the money.

The scripts the telemarketers used varied depending on the movie they were pitching, but there were many common elements. In initial solicitation cold-calls, the fronters stated that: (1) there was little to no risk in the investment because there were presale distribution contracts for the movies,

which guaranteed that the investors would recoup their investments and make a profit; (2) investors would quickly begin to receive returns because the movies were completed or nearing completion and, with the presales contracts, would be distributed in the near future; (3) films previously produced by the same company had yielded good returns for investors; (4) the money invested would be used to make, promote, and distribute the movies, not to pay for fundraising, overhead expenses, or sales commissions; (5) the marketers earned little to no commissions; (6) investors would get their money back and more out of the movie proceeds before the promoters and sellers were paid; and (7) there was a time limit because the units would shortly become unavailable, requiring a quick commitment.  These statements were affirmatively and materially false or omitted material information needed to make them true.

The evidence presented at trial and recounted in the presentence reports showed that there were few or no guaranteed presale distribution contracts and no prospects of obtaining them.  While some of the movies were finished and failed in distribution, some were not in production and were never made.  Prior investors in films produced by the same company had lost money.  Most of the money from investors did not go to make or distribute the films, but to pay personnel and promoters.  Most of the telemarketers earned 35 percent in commissions, although some earned as little as 12 percent and others as much as 40 percent.  There was no time limit on the investments.  Lies abounded.

If a fronter's cold-call produced an expression of interest, the potential investor would receive a private placement memorandum. The memorandum contained some cautionary language but repeated many of the same lies.  Closers would

follow up, making similar promises to get signed investment contracts and checks.  Some of the investors were later targeted for reloading through the staged conference calls.  In general, the defendants did not contend that the statements they made were true, but rather that they believed what they were told to say.

The first set of issues analyzed below arises from the sentencing appeals of the two defendants who pleaded guilty, Robert Keskemety and James Lloyd.  The second set of issues arises from the appeals of the three defendants tried together and convicted.

## DISCUSSION

## I.  Keskemety's and Lloyd's Sentencing Appeals

## A.  The Standard of Review

We review a district court's sentencing decision for an abuse of discretion.  *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc).  A district court abuses its discretion when it improperly calculates the Guidelines range or bases its sentencing decision on clearly erroneous facts.  *Id.*; *United States v. Treadwell*, 593 F.3d 990, 999 (9th Cir. 2009).  When a defendant does not object at sentencing, we review for plain error.  *See United States v. Vargem*, 747 F.3d 724, 727 (9th Cir. 2014).  "Under the plain error standard, relief is warranted where the district court committed (1) error that (2) is plain; (3) 'affected substantial rights;' and (4) 'seriously affected the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* at 728 (quoting *United States v. Teague*, 722 F.3d 1187, 1190 (9th Cir. 2013)).

**B. The Guilty Pleas and Sentences**

In 2002, Michael Sellers hired Keskemety to set up and run a telemarketing boiler room in Florida to solicit investments in the two *Dolphin* movies. Keskemety would pay for the boiler-room expenses, including buying his own lead lists and paying the telemarketers. Sellers would pay Keskemety 25 to 40 percent of the money raised in the Florida boiler room. Keskemety began running the boiler room in 2004, soliciting investments first for the *Eye of the Dolphin*, then for the *Way of the Dolphin*. The telemarketers made their solicitation calls using lead lists Keskemety purchased from Craft. Keskemety managed the Florida boiler room from 2004 to 2009. During this period, the telemarketers raised approximately $2 million from victims who invested in making and marketing the two *Dolphin* films.

Lloyd worked as Cinamour's boiler-room manager from 2003 to 2007. Among other things, Lloyd recruited telemarketers and helped prepare scripts that closers used to get signed investment contracts and checks.

In 2007, Sellers hired Lloyd to set up and run a boiler room in Los Angeles to sell partnership units in Sellers's *Dolphin* films. Unlike his arrangement with Keskemety in Florida, Sellers paid the overhead for the Los Angeles–based boiler room that Lloyd managed. Lloyd convinced many of the telemarketers who worked with him at Cinamour as closers, including Allen Agler, to join him and do the same kind of telemarketing solicitation for Sellers's *Dolphin* films that they had been doing for Cinamour.

From 2007 to 2009, the California and Florida boiler rooms together sold partnership units in the *Dolphin* movies

to 264 victims, raising $9.3 million. Keskemety contends that his Florida boiler room raised $1.5 to $2 million of this amount. There is no controverting information. Based on this, Lloyd's California boiler room raised approximately $7.3 million. The number of victims attributable to each location is unclear.

The June 2011 indictment arising from the *Dolphin* movies, *United States v. Lloyd*, *et al.*, No. 11-cr-542, charged Keskemety with conspiracy under 18 U.S.C. § 371, two counts of mail fraud under 18 U.S.C. § 1341, and offering and selling unregistered securities under 15 U.S.C. §§ 77e and 77x and aiding and abetting under 18 U.S.C. § 2.[1] On March 2, 2012, Keskemety pleaded guilty without a plea agreement to one count of mail fraud.

The same indictment charged Lloyd with one count of conspiracy under 18 U.S.C. § 371, seven counts of mail fraud under 18 U.S.C. § 1341, seven counts of wire fraud under 18 U.S.C. § 1343, eight counts of offering and selling (or aiding and abetting the offer and sale of) an unregistered security under 15 U.S.C. §§ 77e and 77x and 18 U.S.C. § 2, and two counts of engaging in monetary transactions in property derived from illegal activity under 18 U.S.C. § 1957. Lloyd was also named in *United States v. Toll, et al.*, No. 11-cr-543, arising from the Cinamour film telemarketing. This indictment charged Lloyd with one count of conspiracy under 18 U.S.C. § 371, four counts of mail fraud under 18 U.S.C. § 1341, four counts of wire fraud under 18 U.S.C. § 1343,

---

[1] The indictment also charged Craft for his role at American Information Strategies and Agler, Jady Laurence Herrmann, Joseph McCarthy, Matthew Bryan Wellman-Mackin, Morabito, and Robert Ramirez for their roles as closers.

three counts of offering and selling (or aiding and abetting the offer and sale of) an unregistered security under 15 U.S.C. §§ 77e and 77x and 18 U.S.C. § 2, and one count of engaging in monetary transactions in property derived from illegal activity under 18 U.S.C. § 1957.[2]

In February 2012, Lloyd pleaded guilty to one count of wire fraud in *United States v. Lloyd*; in April 2012, he pleaded guilty to one count of wire fraud in *United States v. Toll*. The two actions were consolidated for sentencing.

Neither Keskemety nor Lloyd appeals his conviction. Both appeal their sentences. Keskemety received an 80-month prison sentence, well below the 121 to 151 month Guidelines range, and was ordered to pay $8,628,733.93 in restitution. The offense level and restitution amount were based on the victims' losses in both the Florida boiler room Keskemety managed between 2004 and 2009 and the Los Angeles boiler room Lloyd managed between 2007 and 2009. Keskemety agrees that he is properly held accountable for the fraud losses from the Florida boiler room while he worked there, but he challenges including the Los Angeles boiler-room fraud losses in his relevant conduct.

Lloyd received a 156-month sentence and had to pay $22,258,489.04 in restitution. He challenges the sentence

---

[2] The indictment also charged Daniel Toll for his role as Cinamour's president; Joel Lee Craft, Jr. for his role as head of American Information Strategies, which supplied Cinamour with telemarketers, sales materials, telephone scripts, private placement memoranda, and lists of prospects to cold-call; and Bart Douglas Slanaker, Allen Bruce Agler, Delitha Floyd, Brian Emmanuel Ellis, Daniel Morabito, and Daryl Van Snowden, who were closers.

length as both procedurally flawed and substantively unreasonable.

## C. Keskemety's Sentencing Appeal

The district court largely adopted the revised presentence report and overruled Keskemety's objections, including his objections to the fraud loss. The court calculated the Guidelines range based on a 20-level increase in offense level under § 2B1.1(b)(1)(K) for $9,304,929.62 in intended fraud losses and a 6-level increase for over 250 victims. These amounts included both the California and Florida victims and their losses. The court calculated restitution the same way, including the 242 investors solicited by the California and Florida boiler rooms who could be identified by name. With a 2-level increase for the vulnerability of some of the victims and a 3-level reduction for acceptance of responsibility, the result was an offense level of 32, which produced a sentencing range of 121 to 151 months. Citing Keskemety's military service, age, and poor health, the district court sentenced him to serve 80 months in prison and ordered him to pay $8,628,733.93 in restitution.

Keskemety does not dispute that he is accountable for Guideline-calculation purposes for the amount raised from telemarketers' solicitations in the Florida boiler room during the time he managed it, a fraud loss of $1.5 to $2 million. Nor does he dispute that he must pay restitution to the identifiable investors solicited from the Florida boiler room. He does dispute that his relevant conduct includes the fraud losses generated by the Los Angeles telemarketing office that James Lloyd managed during the same period; that the number of victims of the Florida office exceed 250; and that he owes restitution to the identifiable investors solicited by

the Los Angeles as well as the Florida operation.  Kesketemy agrees that he knew that the California boiler room existed and what it was doing, but he disputes that this knowledge is enough to include the fraud losses from the California boiler room in his own relevant conduct.

"[I]n the case of jointly undertaken criminal activity," a defendant is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."      U.S.S.G. § 1B1.3(a)(1)(B).    The defendant is accountable for the conduct of others that was both: "'(i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity.'" *United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir. 1998) (quoting U.S.S.G. § 1B1.3, cmt. n.2).  "[W]e have held that a district court may not automatically hold an individual defendant responsible for losses attributable to the entire conspiracy, but rather must identify the loss that fell within the scope of the defendant's agreement with his co-conspirators and was reasonably foreseeable to the defendant." *United States v. Treadwell*, 593 F.3d 990, 1002 (9th Cir. 2010).  Although a district court need not "proceed item-by-item through a complete list of all losses attributed to a criminal conspiracy and . . . then make an individualized determination whether or not each item was within the scope of the defendant's 'joint undertaking' and was 'reasonably foreseeable' to that defendant," *id.* at 1002–03, the court must make particularized findings about "'the scope of the criminal activity the particular defendant agreed to jointly undertake,'"

*Blitz*, 151 F.3d at 1012–13 (quoting U.S.S.G. § 1B1.3, cmt. n.2).

"In determining the scope of the criminal activity that the particular defendant agreed to jointly undertake (i.e., the scope of the specific conduct and objectives embraced by the defendant's agreement), the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others." U.S.S.G. § 1B1.3, cmt. n.2. The example of jointly undertaken criminal activity in the Application Notes is a street-level drug dealer who pools resources and shares profits with four other street-level drug dealers. The first dealer is engaged in jointly undertaken criminal activity and is accountable for all the drugs he and the four other dealers sell during the time he works with them. Their sales are in furtherance of the first dealer's jointly undertaken criminal activity and reasonably foreseeable to him. *Id.*, cmt. n.2, Illustration (c)(6). By contrast, a dealer who sells to his own customers, in his own territory, and does not share information, other resources, or profits with other dealers who have their own territories and customers, is not engaged in jointly undertaken drug dealing with the other dealers and is not accountable for the drugs they sell. That is true even if the first dealer knows about the other dealers and who they are and knows that the drugs come from the same supplier. Similarly, even if the first street-level drug dealer knows that the person who recruited him to sell drugs also recruited the other dealers for the same purpose, the first dealer is generally accountable only for the drugs he sells. U.S.S.G. § 1B1.3, cmt. n.2, Illustration (c)(7). The dealers are doing the same kind of criminal activity at the same time, but it is not a jointly undertaken criminal activity. U.S.S.G. § 1B1.3, cmt. n.2, Illustration (c)(6).

Knowledge of "another participant's criminal acts is not enough to hold the defendant responsible for those acts," *United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995), and knowledge of a conspiracy's overall objectives does not make the defendant accountable for all the coconspirators' acts furthering those objectives. In the telemarketing context, "the scope of a joint undertaking for sentencing purposes depend[s] on whether the telemarketers 'worked together,' 'relied on one another to make a sale,' attended the same sales meetings, and 'depended on the success of . . . the operation as a whole for their financial compensation.'" *Treadwell*, 593 F.3d at 1005 (quoting *Blitz*, 151 F.3d at 1013). If two defendants, working together, design and execute a scheme to sell fraudulent stocks in a telephone boiler-room operation, each is accountable for all the fraud losses that result. The conduct of each is in furtherance of their jointly undertaken criminal activity and is reasonably foreseeable in connection with that criminal activity. U.S.S.G. § 1B1.3, cmt. n.2, Illustration (c)(2). To determine a defendant's fraud-loss amount and resulting offense level, a district court must consider that defendant's role in the overall scheme. *See Treadwell*, 593 F.3d at 1005; *Studley*, 47 F.3d at 576.

The district court made the following statements about the scope of the criminal activity Keskemety agreed to jointly undertake:

> [T]hat the losses of that amount [$9,304,929.62] to those [264] victims were sustained during the period of, the relevant period of [Keskemety's] participation in the scheme and also that they do include relevant conduct with respect to Mr. Lloyd, and they

were clearly foreseeable and therefore properly attributable to [Keskemety].

The court appeared to base this conclusion on Keskemety's knowledge about Lloyd's operations and Sellers's overall objectives and goals:

> Although [Kesketemy] was in Florida, he was fully aware of all the major facets of the scheme, knew others who were raising money from the [*Dolphin*] movies, [sic] ran his own boiler room operation that employed several closers who worked for him.

The district court did not identify additional facts supporting its conclusion that the solicitation and sales activities in Lloyd's Los Angeles boiler room were within "the scope of the criminal activity [Keskemety] agreed to jointly undertake." U.S.S.G. § 1B1.3, cmt. n.2.

There is evidence that Lloyd and Keskemety were engaged in the same type of activity. Both used similar scripts and materials obtained from Craft's American Information Strategies. But Lloyd and Keskemety did not pool customers, information, or other resources. In this respect, Keskemety was like the drug dealer who gets the drugs he sells from the same source as other dealers and knows about their work, but does not share drugs, customers, or information with them. Keskemety and Lloyd both got lead lists and scripts from Craft, but they did not share information with each other.

At sentencing and on appeal, the government made a number of arguments to show that Keskemety was properly

held accountable for the fraud losses from the Los Angeles as well as the Florida boiler room. The government cited evidence that Keskemety received a commission check when Lloyd reloaded Keskemety's investors, even after Keskemety had stopped actively soliciting investments himself. The district court properly rejected this argument because the government could not show that Keskemety "knew that Lloyd . . . [was] reloading his investors other than the fact that he continued to get paid[.]" The district court was "not convinced that there [was] sufficient evidence that [Keskemety] was aware of . . . the [reloading] conference calls." The district court expressly rejected the statement in the revised PSR that Keskemety profited from the conference calls Lloyd used to reload investors:

> I don't see any evidence in this record that would support this defendant profited from the conference calls or that he provided his investor client list to . . . Lloyd for reloading.

The record shows that Keskemety did not benefit from the solicitations and sales made in Lloyd's Los Angeles boiler room and did not share the proceeds of his boiler-room solicitations with Lloyd.

The government argues that Keskemety and Lloyd were "acting in concert for the same purported goal: to raise money for Sellers." The fact that Keskemety and Lloyd independently worked for Sellers does not mean that Keskemety and Lloyd jointly undertook their criminal activity. Similarly, the government urges that because "all [telemarketers] used the same materials to sell the deal," all were engaged in jointly undertaken criminal activity. As Keskemety points out, using the same marketing materials

does not tie Keskemety's compensation to Lloyd's solicitations and sales such that the California fraud losses should be included in Keskemety's relevant conduct. The fact that Keskemety dealt with some investors who complained and "lulled" them does not show that he did so for Lloyd's investors or that Lloyd shared in the benefits of this work. Evidence that Keskemety eventually "went to a salary plus bonus payment plan that was equal to the commissions he would have earned," does not tie Keskemety's compensation to Lloyd's solicitations and sales sufficiently to include the California fraud loses in Keskemety's relevant conduct.

The government cites evidence that Keskemety had an acting role in one of the *Dolphin* movies, but this does not show that he had an interest in the success of the operation as a whole that would justify including the fraud losses from the Los Angeles boiler room in his own relevant conduct. Keskemety had a very small role in the film, and there is no evidence that it contributed to making the money Lloyd raised through the California boiler room.

In sum, the record support for holding Keskemety accountable for Lloyd's similar criminal activity appears limited to Keskemety's knowledge of Lloyd's operations and of Sellers's overall objectives and goals. That is not enough, given the evidence that Keskemety operated the Florida boiler room independently from Lloyd's California boiler room and did not share information, resources, or profits.

The government contends that *United States v. Blitz*, 151 F.3d at 1012, supports holding Keskemety accountable for the losses attributable to the Los Angeles–based boiler room. The telemarketing scheme in *Blitz* was different from

the scheme the record discloses here.  In *Blitz*, the "[d]ialers and closers strongly relied on one another to make a sale," "[a]ll employees attended sales meetings," and the "employees did not work on a pure commission basis" and instead "received a salary," thus making them "depend[] on the success of the [fraudulent] operation as a whole for their financial compensation."  151 F.3d at 1013.  In holding the individual telemarketers accountable for the money raised by the other telemarketers as reasonably foreseeable jointly undertaken criminal activity, the *Blitz* court distinguished *Studley*, in which the court refused to hold one telemarketer accountable for the other telemarketers' intended fraud losses.  In *Studley*, the defendant "did not design or develop the fraudulent scheme; did not work in any way to further the scheme outside of his own sales efforts; was paid on a pure commission basis, receiving no profits from the overall operation; did not assist other representatives with their sales, but rather competed with them for commissions; did not pool resources with other telemarketers; and had no interest in the success of the operation as a whole."  *Blitz*, 151 F.3d at 1013.

The record shows that Keskemety is much closer to the defendant in *Studley* than to the telemarketers in *Blitz*. Keskemety did not design or develop the overall scheme; Sellers did.  Lloyd joined the conspiracy to raise money for the *Dolphin* movies long after Keskemety.  Keskemety's efforts to further the scheme related to the boiler room he managed.  He did not pool resources with Lloyd's boiler room, and he was paid commissions  based on the proceeds from the Florida boiler room's sales.

The other cases the government cites do not change the analysis.  In *United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010), "[b]oth defendants described themselves as

'founders' of the investment companies they were asking investors to support with funds," "[b]oth defendants led conference calls with the companies' nationwide sales force," "[b]oth defendants traveled around the country selling their companies' investment strategy," "[b]oth defendants misrepresented the investments made by their companies," and "both defendants profited from the mutual efforts of their coconspirators in selling non-existent investments." *Id.* at 1005. In this case, by contrast, the district court did not make similar particularized findings of jointly undertaken criminal activity.[3] Instead, the district court did not find, and the present record does not show, that the solicitations made and money obtained from Lloyd's Los Angeles boiler room were within the scope of the criminal activity that Keskemety agreed to undertake for Sellers.

We reverse the district court's judgment on the amount of fraud loss, vacate the restitution order, and remand for resentencing. We need not and do not address Keskemety's other arguments about substantive reasonableness or restitution.

## D. Lloyd's Sentencing Appeal

Lloyd pleaded guilty to one count of wire fraud in each of the two cases naming him as a defendant, and he does not

---

[3] The government also cites *United States v. Boatner*, 99 F.3d 831 (7th Cir. 1996), in which the court held that the defendants, conspirators in an insurance-fraud scheme, were accountable for the entire scheme's fraud losses despite the fact that they had not pooled profits or resources. The court distinguished *Studley* because the *Boatner* defendants "concocted a common story; they feigned injuries together; they lied to the police together; and they retained the same attorney to pursue a fraudulent claim against a single victim." *Id.* at 837. No such evidence is present here.

challenge his convictions. He does challenge the 156-month sentence the district court imposed as both procedurally flawed and substantively unreasonable.

"Procedural errors include, but are not limited to, incorrectly calculating the Guidelines range, treating the Guidelines as mandatory, failing to properly consider the [18 U.S.C.] § 3553(a) factors, using clearly erroneous facts when calculating the Guidelines range or determining the sentence, and failing to provide an adequate explanation for the sentence imposed." *United States v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008). The district court's 156-month sentence was a downward variance from the Guidelines range of 210 to 262 months. Lloyd asserts—for the first time on this appeal—that the district court failed adequately to explain why it did not impose an even lower below-Guidelines sentence. His argument is without merit.

The district court thoroughly explained its reasons for the sentence in over 20 pages of transcript. A careful review of the record satisfies us that the sentence was procedurally sound and that the district court did not abuse its discretion, much less plainly err, in the below-Guidelines sentence imposed and the explanation provided.

Lloyd's argument that the district court erred in not departing further goes to substantive reasonableness. *See United States v. Ellis*, 641 F.3d 411, 421 (9th Cir. 2011). The record shows that the 156-month sentence, well below the bottom of the Guidelines range, was substantively reasonable in light of the 18 U.S.C. § 3553(a) sentencing factors and the totality of the circumstances. *See Gall v. United States*, 552 U.S. 38, 51 (2007).

We affirm.

## II. The Appeals from the Convictions: Baker and Nelson

## A.  The Indictments

Baker, Nelson, and Greenhouse were indicted in *United States v. Daniel Toll, et al*., No. 11-cr-543, for soliciting investments in the Cinamour movies.  Baker was charged with one count of conspiracy under 18 U.S.C. § 371, two counts of mail fraud under 18 U.S.C. § 1341, two counts of wire fraud under18 U.S.C. § 1343, and two counts of offering and selling (or aiding and abetting the offer and sale of) an unregistered security under 15 U.S.C. §§ 77e and 77x and 18 U.S.C. § 2.  Nelson was charged with one count of conspiracy under 18 U.S.C. § 371, two counts of mail fraud under 18 U.S.C. § 1341,  two counts of wire fraud under 18 U.S.C. § 1343, and two counts of offering and selling (or aiding and abetting the offer and sale of) an unregistered security under 15 U.S.C. §§ 77e and 77x and 18 U.S.C. § 2.  Greenhouse was charged with one count of conspiracy under 18 U.S.C. § 371, three counts of mail fraud under 18 U.S.C. § 1341, and two counts of offering and selling (or aiding and abetting the offer and sale of) an unregistered under 15 U.S.C. §§ 77e and 77x and 18 U.S.C. §  2.  The three defendants were tried together.

Baker worked from his home in California as a closer from 2004 to 2009, soliciting investments in *From Mexico with Love* and in *Red Water*.  Nelson worked in Cinamour's Sherman Oaks and Encino, California, offices as a fronter and closer from October 2007 to May 2009, soliciting investments in *Red Water*.  Greenhouse worked from his

home in Florida from 2005 to 2007, soliciting investments in partnership units for *From Mexico with Love*.

The jury convicted Baker and Nelson on all the counts submitted against them. The jury acquitted Greenhouse of conspiracy and mail fraud but convicted him for offering and selling unregistered securities and aiding and abetting and causing those sales, in violation of 15 U.S.C. §§ 77e and 77x and 18 U.S.C. § 2.

At sentencing, the district court calculated a 292 to 365 month Guidelines range for Baker but varied downward, imposing a 194-month prison term and a $12,043,678.25 restitution obligation.  The district court calculated a 97 to 121 month Guidelines range for Nelson but sentenced him to serve 84 months in prison and to pay $1,860,000 in restitution.   Baker and Nelson timely appealed their convictions and sentences.  Greenhouse was sentenced to 60 months in prison, below the Guidelines range of 63 to 78 months, and to pay $530,000 in restitution.  He appeals only his sentence.

## B.  Baker's and Nelson's Challenges to Their Convictions

### 1.  The Trial Evidence Against Baker

In 2001, Hartford hired Baker as an "associate producer" at Cinamour.  Baker was working as a telemarketer soliciting money for *Forbidden Warrior* when he was arrested and jailed in March 2003 for a parole violation.  Baker went back to working for Cinamour in January 2004 and, with his partner, worked for Cinamour out of their home in Coachella Valley, California until 2009.

In March 2004, Baker and his partner, doing business as Independent Essentials, entered into a written agreement with Cinamour for a 20 percent commission on the money they raised working as telemarketers and closers soliciting investments in *From Mexico With Love*. From January 2005 to January 2007, Baker closed $200,000 in *From Mexico With Love* investments. Baker also earned a commission for the investments that Lloyd closed using Baker's investor list from *Forbidden Warrior*. Lloyd used Baker's investor information to reload those who had sent money for *Forbidden Warrior*, producing more money for *From Mexico With Love*.

In 2007, Cinamour stopped soliciting for *From Mexico With Love* and turned to soliciting money from investors for *Red Water*. Baker and his partner ran the *Red Water* fundraising. Baker hired codefendant Bart Slanaker, who had experience operating telemarketing boiler rooms. Baker's partner managed the money, received investor checks, and paid commissions. Baker gave Slanaker *Red Water* sales materials and paid him a 15 percent commission.

Baker contacted prospective investors from lead lists. Diane Houseknecht testified that in a letter and conversations, Baker told her that investors would receive 90 cents on every dollar the film earned until they got back all the principal they had paid plus 10 percent. Baker also promised her that the return would be fast. He did not reveal that he would earn a 15 to 20 percent commission. Instead, he emphasized that the investors would get paid before the promoters or salespeople received anything and that the invested funds would be used to make and market the movies, not to pay promoters or salespeople. Houseknecht, who had no investment experience, invested $25,000 in *Forbidden Warrior*, $10,000

in cash and $15,000 from her retirement account. She got back $1,000. Lloyd later convinced Houseknecht to invest another $20,000 in *From Mexico with Love*, using $10,000 in cash and $10,000 from her retirement account.

Gary Tranter testified that Baker called him in 2002 to solicit an investment in *Forbidden Warrior*. In the telephone call, Baker compared *Forbidden Warrior* to the well-known and commercially successful film *Crouching Tiger, Hidden Dragon*. Baker stated that a majority of the *Forbidden Warrior* units had already been sold and that Tranter needed to act quickly. Baker told Tranter that *Forbidden Warrior* was ready for release in theaters in the near future; it was not. Baker also said that investors would be paid back first and that promoters and sales personnel would be paid only after the investors. Baker did not disclose the fact or amount of commissions he and others were getting. Tranter worked as a wholesale broker of indoor houseplants and had little financial or investment experience. He invested $10,000 in *Forbidden Warrior* and got back $800. Baker unsuccessfully tried to reload Tranter in *From Mexico With Love* but did get him to send another $5,000 for *Red Water*. Tranter never got any of his investment in *Red Water* back.

Another investor, Thomas Beacham, an office manager for a paint shop, testified that Baker cold-called him in 2002 about investing in *Forbidden Warrior*. Baker told Beacham that *Forbidden Warrior* would be a "big moneymaker" because it was comparable to *Crouching Tiger, Hidden Dragon*. When Beacham said that he did not have the money to invest, Baker emphasized that this was a limited-time offer and asked if Beacham had retirement savings he could use. When Beacham pointed out that he did not meet the requirements for an accredited investor—including that his

net worth was far below the $1 million minimum—Baker urged him not to "worry about that. It's just in there for formality. We can make an exception in your case."

Beacham invested $5,000 from his retirement account in *Forbidden Warrior*. Baker successfully convinced Beacham to invest another $10,000 from his retirement account in *From Mexico With Love* after Beacham participated in a reloading conference call run by Lloyd and Agler. Beacham lost all the money he invested except "a hundred bucks or so." Beacham testified that he had lost his job in 2008 and had to cash out his retirement account, which was "15 grand shorter than it probably should have been."

FBI Special Agent Sean Sterle, who worked undercover posing as a Florida businessman interested in investment opportunities, also testified. After a cooperating witness introduced Baker to Sterle, five or six telephone conversations followed in which Baker tried to convince Sterle to invest in *Red Water*. Sterle recorded his conversations with Baker and the jury heard them at trial. The recordings included Baker's statements that *Red Water* had secured $5.4 million in presale commitments to distribute the film in 31 countries; that the presales revenues would pay investors a 110 percent return; that Sterle would receive a 110 percent return in eight to ten months, get his full investment back within the year, and triple his money in two years; and that the sales personnel received no commissions.

The evidence showed that the promises Baker repeatedly made were either false or made without any reasonable basis to believe that they were true.

### 2. The Trial Evidence Against Nelson

David Nelson worked for Cinamour as a fundraising telemarketer from October 2007 to May 2009. Nelson had a sad personal history. He began drinking at age 11. He dropped out of high school. His drinking and drug use lost him job after job. He tried to rehabilitate himself by joining the Marines, which trained him as a software engineer, but even the Marines could not get him to stop drinking. He received a general discharge. Although the training helped him get jobs, he lost them every few months. Nelson became homeless in 2001. In 2005, after four years of living on the streets and jumping from one job to another, Nelson got treatment for his alcoholism at a halfway house that required its clients to have jobs. Nelson found work as a telemarketer selling industrial equipment, but lost this job. Nelson again became homeless, living behind a dumpster. On March 30, 2007, paramedics found Nelson behind the dumpster and took him to the hospital.

Nelson readmitted himself to the halfway house for a third time in 2007 and got another telemarketing job. Nelson's supervisor there, Bart Slanaker, later convinced him to follow him to Cinamour's boiler room to work soliciting money for a new movie, *Red Water*.

Several victims testified about talking to Nelson. Melvin Bitikofer was a retired stove salesman who had owned his own store. Nelson cold-called him in October 2007. Nelson described the *Red Water* investment as a once-in-a-lifetime opportunity and promised Bitikofer that he would begin to receive returns as early as the first quarter of 2008. Nelson told Bitikofer that investors would get a 110 percent return, that the movie was already being filmed, that presale

distribution contracts worth $5.9 million were already in place, and that nothing could go wrong. Nelson touted Cinamour's previous movie, *From Mexico With Love*, as a proven commercial success that had rewarded its investors well. Nelson omitted his commissions from the discussions and downplayed the investment risks. Bitikofer invested $50,000.

Nelson and his colleagues successfully reloaded Bitikofer several times. In February 2009, Bitikofer participated in a reloading conference call led by Bart Slanaker. Bitikofer testified that the other persons participating in the call appeared to be potential investors and that they enthusiastically endorsed the *Red Water* investment opportunity. These other participants were, in fact, Cinamour telemarketers. During the call, Bitikofer stated that he did not have more money and that any investment would have to come from his wife's IRA. After the call, Nelson and Slanaker persuaded Bitikofer to get $100,000 from his wife's IRA.

Bitikofer and his wife invested a total of $250,000, which they repeatedly told Nelson was from their retirement and IRA funds. They lost all they invested. Bitikofer testified that this loss resulted in a "[t]errible" financial hardship for the couple. They could "hardly keep up with the bills coming in" and faced the prospect of "tak[ing] out bankruptcy."

Richard Clark was a farmer with no investment experience. He wanted a conservative investment that could provide some income to help him stop farming because of its physical demands. Nelson cold-called Clark in April 2009

and solicited him to invest in *Red Water.*[4]  Clark told Nelson what he did for a living and that he had no investment experience.  Nelson told Clark that very few units were left and that the investment was the "best thing" he had seen in his career.  Nelson told Clark that he would start to receive distributions by the summer of 2009.  Nelson assured Clark that there were already enough presale contracts to cover production and marketing costs and ensure him a fast profit.

Clark also participated in a conference call with Slanaker, Nelson, and people he understood to be other investors. Clark testified that Nelson actively participated in this call. Clark invested $15,000, which he lost; he described the loss as "a bad lick for me."

Dennis Eliassen was retired when Nelson cold-called him in June 2008.  Nelson told him that Cinamour already had $6 million in presale contracts, twice the amount needed to cover all the film production and marketing costs.  Nelson sent Eliassen an email assuring him that investment "security is in place through our pre-sales distribution."  Nelson told Eliassen that everything was on track to begin filming *Red Water* in December 2008, and that the investors would be paid first and quickly.  Nelson also told him that *From Mexico With Love* and *Forbidden Warrior* had been successful for the investors.  Eliassen invested $50,000 from his IRA and lost it all, a "pretty" big hardship.

---

[4] Clark at first testified that Nelson called him in April 2005 to raise money for *Red Water*, but other evidence and Clark's testimony that he was "a little rusty" about the precise date shows that it was actually April 2009.

Connie Hurd testified that when Nelson cold-called her in early 2008, she told him that she and her husband owned a tool company and had very little investment experience. Nelson assured her that the *Red Water* investment presented minimal risk and that the investors would be paid back everything before the promoters and sales personnel received anything. Nelson assured her that Cinamour already had presale contracts projected to be worth $5.9 million, which guaranteed a secure and profitable investment. Nelson did not disclose the existence or amount of his or others' commissions. Hurd lost her $5,000 investment.

The jury heard from Stephanie Alarcon, a Cinamour telemarketer hired by Slanaker to work as a fronter cold-calling potential investors and passing the names of those expressing interest to closers, who would follow up to finalize the sale. She made the calls from a lead list and read a script. Nelson listened to make sure she did it properly and gave her tips. Nelson asked her to write down personal information potential investors gave her in the calls for him to use in his closing pitches. Alarcon followed this instruction. For example, when she talked to Richard Clark, she noted that he was a Christian and that Nelson should emphasize "Christian things" in trying to finalize his investment. Alarcon's account of what she was told to say when she called potential investors was consistent with their testimony about what they were promised.

Nadav Shimoni, another fronter, testified that he participated with Nelson in some of the reloading conference calls. Nelson would read a sales pitch from a script, and Shimoni would pretend that he was an investor who had decided to invest more money. His testimony was consistent

with what the investors who participated in these calls described.

Nelson testified and told the jury about his background. He testified that in April 2007, just after he became sober, he got a job as a telemarketer working under Bart Slanaker. Nelson testified that Slanaker was so domineering and abusive that Nelson feared him and was intimidated into doing whatever Slanaker told him to do. His fear of losing yet another job contributed to his unquestioning obedience.

Nelson testified that when he began working at Cinamour, he believed it was legitimate. Slanaker took Nelson to the production location for *From Mexico With Love*. Nelson testified that he recognized Cinamour's logo and some of the actors in the film. Nelson looked at Cinamour's website and saw that it was a production and distribution company working in film and television. Nelson read that the Better Business Bureau rated Cinamour Triple A, with no complaints. Nelson learned that Cinamour was raising money for *Red Water*. In October 2007, Nelson followed Slanaker to Cinamour and began soliciting investments in *Red Water*.

Nelson testified that Slanaker prohibited him from associating with anyone else at Cinamour. The office manager testified that Slanaker often screamed at Nelson, who remained quiet and kept to himself, away from the other telemarketers.

Nelson testified that at Cinamour, he was given lead sheets and a script. If a call was met with interest, Nelson filled out a sheet and gave it to Slanaker, who sent an information package to the potential investor. Nelson would

then call and go over the package using a preset script, answer questions, and try to persuade the prospect to sign the papers and send a check made out to *Red Water* Films.

Nelson testified that he did not know that the representations he made were false and insisted that he did not intend to defraud investors. He believed that the purpose of the script was to keep the telemarketers honest about what they told potential investors, not to give the telemarketers lies to tell. He also believed that Cinamour had $5.9 million in presale distribution contract commitments. Nelson acknowledged that he was getting paid for the sales he made but testified that he did not lie when he stated that no commissions were being paid, because what he received was a "management fee." Nelson did admit, however, that the *Red Water* private placement memorandum he sent to potential investors provided a misleading description of how and when the promoters and sales people would be paid.

Nelson testified that he thought the conference calls he participated in were to give status reports to people who had already invested. Nelson denied knowing that the calls were to "reload" investors or that Cinamour employees were playing the role of happy investors. Nelson was shown a script for a reloading conference call. The script identified him as the Vice President of Technology at View Partners. Nelson denied having seen or used the script or having read or heard that false description of his job and title, but the script was found on Nelson's office computer at Cinamour. The government pointed out that the script made clear the purpose of the call and the presence of the fake "other investors." The script contained a list of the Cinamour employees who participated in at least one reloading conference call playing the role of investors. The script also

had handwritten notes about some of the victims who took part. Nelson denied that the notes were his. But another exhibit, which Nelson admitted to writing, had very similar handwriting. The government argued that the similarity between the two documents provided additional support for inferring that Nelson was lying about his role in the *Red Water* conference calls, about not knowing that Cinamour employees were acting as shills, and about not having seen scripts for the calls.

## C. Baker's and Nelson's Challenges to Their Convictions

Baker and Nelson challenge the trial court's evidentiary rulings and jury instructions, the prosecutor's comments at closing, and the sufficiency of the evidence. They contend that if no one error justifies vacating their convictions, the cumulative effect does. We identify several errors, find them harmless as to Baker, but conclude that Nelson's conviction must be reversed.

### 1. The Challenges to the Evidentiary Rulings

We review the district court's evidentiary rulings for abuse of discretion. *See United States v. Pineda-Doval*, 614 F.3d 1019, 1031 (9th Cir. 2010).

#### a. The Victims' Testimony

Baker and Nelson argue that the district court should not have allowed victims to testify about their financial situations and the impact of losing the money they invested. Baker and Nelson argue that the district court erred in admitting the victims' testimony because the risk of unfair prejudice

substantially outweighed the probative value.  *See* Fed. R. Evid. 403.  We disagree.

Because Nelson objected to Eliassen's testimony, we review its admission as to both Nelson and Baker for an abuse of discretion.  *See United States v. Orm Hieng*, 679 F.3d 1131, 1141 (9th Cir. 2012).[5]  We review testimony elicited without objection for plain error.  *See United States v. Lopez*, 762 F.3d 852, 859 (9th Cir. 2014).

"A district court's Rule 403 determination is subject to great deference, because 'the considerations arising under Rule 403 are susceptible only to case-by-case determinations, requiring examination of the surrounding facts, circumstances, and issues.'"  *Hinkson*, 585 F.3d at 1267 (quoting *R.B. Matthews, Inc. v. Transamerica Transp. Serv., Inc.*, 945 F.2d 269, 272 (9th Cir. 1991)).  Eliassen's testimony that he told Nelson that he had no cash to invest and would have to use his retirement money was relevant to rebut the defendants' argument that they believed their investor-victims to be accredited investors.  Eliassen also testified that losing his investment was a "very big" hardship.  Any error in admitting this limited and brief victim-impact testimony was harmless.  The thrust of Eliassen's testimony

---

[5] Although only Nelson objected to Eliassen's testimony, the government concedes that "[a]buse-of-discretion review applies to [Baker's] claim regarding Eliassen."  *See United States v. Orm Hieng*, 679 F.3d 1131, 1141 (9th Cir. 2012) (reviewing the defendant's claim of evidentiary error for abuse of discretion even though he did not object because his codefendant did and "the matter was sufficiently brought to the attention of the district court").

was relevant to show not only what Nelson said, but also what he knew and intended.**[6]**

For similar reasons, the district court did not plainly err by allowing Bitikofer, Beacham, and Clark to testify about how they described their financial situations to Nelson or Baker. Both Nelson and Baker argued at trial that they believed each person they successfully persuaded to invest in partnership units was a wealthy and experienced investor who could afford to lose the money. The testimony was relevant to rebut this defense, and there was no error, much less plain error, in allowing it. Although these victims also briefly described the impact of losing the money, that limited testimony did not affect the defendants' substantial rights. There was no plain error.

Baker and Nelson contend that Rao's testimony that Greenhouse refused to return the money he and his girlfriend invested, even after Greenhouse was told that it was needed for her cancer treatment, was plain error. Rao's testimony discussed only Greenhouse and Agler and did not mention either Baker or Nelson. At oral argument, Nelson's counsel agreed that this testimony prejudiced only Greenhouse. Baker, however, contends that Rao's testimony "was unfairly prejudicial to all the trial defendants because they were charged in Count One with a conspiracy" and the district

---

**[6]** The parties do not cite Ninth Circuit case law on using similar victim-impact testimony to show intent to defraud. Other circuits have allowed it under limited circumstances. *See, e.g.*, *United States v. Cloud*, 680 F.3d 396, 402 (4th Cir. 2012) (district court did not abuse its discretion in admitting victim-impact testimony because it "met the low bar of relevancy, given [the defendant's] defense that the [victims] were guilty of bank fraud."). The case law also recognizes limits on such testimony. *See, e.g.*, *United States v. Copple*, 24 F.3d 535, 544–46 (3d Cir. 1994).

court did not specifically instruct the jury to consider the testimony only against Greenhouse. The record shows that any error in failing to give the limiting instruction was not plain and did not affect Baker's or Nelson's substantial rights.

Baker separately argues that because he had no duty to tell potential investors about the commissions he was paid, the district court erred in allowing the victims he solicited to testify that they would not have invested had they known about the commissions. Baker relies on cases stating that "[a]bsent an independent duty, such as a fiduciary duty or an explicit statutory duty, failure to disclose cannot be the basis of a fraudulent scheme," *United States v. Ali*, 620 F.3d 1062, 1070 n.7 (9th Cir. 2010) (internal quotation marks omitted), and that "otherwise truthful statements made by [a broker] about the merits of a particular investment are not transformed into misleading 'half-truths' simply by the broker's failure to reveal that he is receiving added compensation for promoting a particular investment," *United States v. Skelly*, 442 F.3d 94, 97 (2d Cir. 2006). Baker's argument fails to take into account the evidence that he affirmatively told victims that he, other sales personnel, and promoters would not receive any commissions or other payments until after the investors had received a 110 percent return. Baker's argument also fails to take into account that the *Red Water* private placement memorandum, which Baker sent to Gary Tranter and to the undercover FBI agent posing as an investor, included the false statement that no commissions would be paid until the investors had received a profitable return on their investments. The jury heard recorded conversations of Baker telling the undercover FBI agent posing as an investor that he received no commissions. Baker admitted that he lied to the agent about commissions. "[A] broker cannot affirmatively tell a misleading half-truth

about a material fact to a potential investor . . . [because] the duty to disclose in these circumstances arises from the telling of a half-truth, independent of any responsibilities arising from a truth relationship." *United States v. Laurienti*, 611 F.3d 530, 541 (9th Cir. 2010).

Baker's affirmative misrepresentations that he would receive no commissions until the investors received a profitable return supported his fraud conviction without the need to prove a fiduciary relationship. *See United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986) ("Proof of an affirmative, material misrepresentation supports a conviction of mail fraud without any additional proof of a fiduciary duty."). The district court did not err in allowing the victims to testify about Baker's representations and omissions about commissions.

### b. The Lay Opinion Testimony

Baker and Nelson argue that the district court erred in allowing Allen Bruce Agler,[7] who had worked in several movie telemarketing boiler rooms (including for Cinamour during the fundraising for *From Mexico With Love* between 2005 and 2007), to testify about boiler-room management, activity, and strategy. Agler's testimony included his opinions about the information and knowledge telemarketers have when they cold-call potential investors and when they close a deal. Agler's testimony was not admissible under Rule 702 of the Federal Rules of Evidence because the government did not give the defendants the notice required under Rule 16 of the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 16(a)(1)(G) (requiring, at the

---

[7] Agler also used the name Paul Kingman.

defendant's request, pretrial disclosure of expert witnesses and a written summary of their testimony). Baker and Nelson argue that this limit could not be avoided by admitting Agler's testimony as lay opinion testimony under Rule 701.

"The admissibility of lay opinion testimony under Rule 701 is committed to the sound discretion of the trial judge and his decision will be overturned only if it constitutes a clear abuse of discretion." *United States v. Gadson*, 763 F.3d 1189, 1209 (9th Cir. 2014) (quoting *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051 (9th Cir. 2008)). The government contends that plain-error review applies because Baker objected on other grounds, not raised on appeal, before moving to strike Agler's testimony as unnoticed expert testimony, and Nelson did not specifically adopt Baker's objections. But Baker's attorney repeatedly objected to Agler's testimony about whether investors ever read the private placement memoranda they were sent. The objections were that Agler was giving "an expert opinion without foundation," as well as hearsay. "[T]he matter was sufficiently brought to the attention of the district court" through Baker's objections for us to review for abuse of discretion. *Gadson*, 763 F.3d at 1201 n.3 (quoting *United States v. Orm Hieng*, 679 F.3d 1131, 1141 (9th Cir. 2012)).

Under Federal Rule of Evidence 701, a lay witness may testify "in the form of an opinion" if it is "(a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. "Rule 701(a) contains a personal knowledge requirement." *United States v. Lopez*, 762 F.3d 852, 864 (9th Cir. 2014). "In presenting lay opinions, the personal knowledge requirement

may be met if the witness can demonstrate firsthand knowledge or observation." *Id.* "A lay witness's opinion testimony necessarily draws on the witness's own understanding, including a wealth of personal information, experience, and education, that cannot be placed before the jury." *Gadson*, 763 F.3d at 1208. But a lay opinion witness "may not testify based on speculation, rely on hearsay or interpret unambiguous, clear statements." *United States v. Vera*, 770 F.3d 1232, 1242 (9th Cir. 2014).

Agler testified about his experience in working in telemarketing boiler rooms selling investments. He testified that:

- "[e]verybody that I've ever worked with will always stretch the truth and make out—outright lies especially in certain techniques";

- "[i]n my experience, the vast majority of people who invest do not read the private placement memorandum or if they do they read it on a limited basis, and they have no idea what it says";

- this was "absolutely" a "well-known fact" in the boiler rooms that he worked in; and

- investors relied on what telemarketers told them.

On cross-examination, Agler testified that "most investors never gave me an indication that they read the private placement memoranda" and he never brought "the subject up" when "he talked to them." When pressed on the basis for this opinion, Agler testified that he relied on his experience and the assumption that only those investors who asked a lot

of questions about a memorandum had read it. On redirect, the government asked whether the fact that "investors did not read" private placement memoranda was "something that was openly discussed among closers that you worked with?" Agler responded, "sure." When asked if "it was a topic of discussion that investors don't read the [private placement memoranda]," he responded, "absolutely."

At the end of Agler's testimony, the prosecutor asked whether, "in all your own personal experience and all the closers who have worked in these rooms that you've spoken to, have you ever heard of any investor making any money on any of these investments?" Agler responded, "[n]o, I have not."

Baker and Nelson argue that Agler's testimony impermissibly opined on what the telemarketers who solicited and closed investments, including themselves, knew about what they were selling and about what the investors were doing and thinking. They argue that to the extent Agler expressed a lay opinion, he relied on speculation and hearsay, and to the extent he expressed an expert opinion based on specialized knowledge gained from working in boiler rooms, the government failed to give the notice required under Rule 702 of the Federal Rules of Evidence and Rule 16 of the Federal Rules of Criminal Procedure.

Agler had extensive personal experience working as a telemarketer in boiler rooms soliciting and closing investments, including in Cinamour films. But his testimony that investors did not understand the risks, that all telemarketers knew of and took advantage of this ignorance, and that telemarketers knew that investors never made any money, was largely based on statements he heard from

unidentified telemarketers and investors, well beyond his own personal experience with investors. Our cases make clear that Rule 701 prohibits opinions based on such a foundation. *See, e.g.*, *United States v. Freeman*, 498 F.3d 893, 904 (9th Cir. 2007) ("If Shin relied upon or conveyed hearsay evidence when testifying as a lay witness or if Shin based his lay testimony on matters not within his personal knowledge, he exceeded the bounds of properly admissible testimony.").[8]

Agler's testimony is different from the lay testimony that we have permitted law-enforcement officers to give. *See, e.g.*, *Gadson*, 763 F.3d at 1208; *United States v. Simas*, 937 F.2d 459 (9th Cir. 1991). In those cases, the officers did not base their lay opinions on hearsay statements made by unidentified individuals. *See Simas*, 937 F.2d at 464 (no abuse of discretion in allowing FBI agents to interpret the defendant's own "vague and . . . incomprehensible"

---

[8] The government did not argue that Agler's testimony about what other closers had told him was admissible under the coconspirator exception to the hearsay rule until oral argument in this court. The argument is both untimely and unpersuasive. Agler did not identify the Cinamour closers who made the hearsay statements. Although Rule 801(d)(2)(E) provides that statements made by a "party's coconspirator during and in furtherance of the conspiracy" are "not hearsay," Fed. R. Evid. 801(d)(2)(E), more information about who made the statements would be needed to establish that the persons were coconspirators and that the statements were in furtherance of the conspiracy. *See, e.g.*, *United States v. Mouzin*, 785 F.2d 682, 692 (9th Cir. 1986) ("[B]efore a statement is that of a 'co-conspirator' there must be independent proof of the defendant's and the declarant's status as members of the same ongoing conspiracy. In order to corroborate or refute this status, the litigants must know the identity of the declarant."). Because Agler's testimony about these other unidentified telemarketers was both vague and general, we cannot conclude on this record that the statements were made by Cinamour coconspirators or in furtherance of the Cinamour conspiracy.

statements).  In *Gadson*, we held that the district court did not
abuse its discretion in admitting lay opinion testimony that
the defendant's coconspirator "made these admissions to us
[the police]" because the officer "did not testify as to the
nature of 'these admissions,' repeat any assertion made by
[the coconspirator], or suggest that the jury should consider
any admission made by [the coconspirator] to be truthful."
763 F.3d at 1211–12.  We emphasized that "an officer's
interpretation of intercepted phone calls may meet Rule 701's
'perception' requirement when it is an interpretation 'of
ambiguous conversations based upon [the officer's] direct
knowledge of the investigation.'" *Id.* at 1207 (quoting
*Freeman*, 498 F.3d at 904–05).  Here, by contrast, Agler's
opinions that all telemarketers knew that investors rarely—if
ever—read any private placement memoranda and never
received a return on their investments were based primarily
on the statements of unidentified telemarketers and of
unidentified investor-victims.  And, unlike the record we
considered in *Gadson*, Agler testified about the nature of
statements by other, unidentified telemarketers and investors.
Agler's testimony was not admissible as lay opinion
testimony under Rule 701.

During closing argument, the prosecutor urged the jury to
consider the statements Agler testified he heard to be truthful
and encouraged the jury to rely on them:

> Ladies and gentlemen, do you remember
> when Allen Agler testified and he told you
> that he committed fraud in this case and he
> pled guilty, and he stated that in all his
> experience as a telemarketer in boiler rooms
> raising money for movies, and in all his
> discussions with other people who were boiler

> room closers, not one single investor that he
> knew of in a movie investment from cold call
> telemarketing ever made a cent, not one?
>
> . . . .
>
> Remember, all the closers knew that no
> investor makes money from an independent
> movie where the money is raised by cold call
> telemarketing.

Agler testified that all victims ignored the written materials—including any risk-disclosure statements in the private placement memoranda—and instead relied exclusively on what the telemarketers orally promised in their sales pitches, and that all telemarketers knew and relied on victims following this pattern. Agler based his testimony on taking as true the contents of statements made by unidentified telemarketers and victims. The record is inadequate to allow us to conclude that a hearsay exception or exclusion applies.

The government argues that any error in admitting Agler's testimony under Rule 701 was harmless because he would have qualified as an expert under Rule 702. The government cites *United States v. Mendoza*, 244 F.3d 1037 (9th Cir. 2001), and *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246–47 (9th Cir. 1997). Both cases are distinguishable. In *Mendoza*, the defendant was tried and convicted for endangering the safety of an aircraft in flight after he called in a bomb threat to delay a flight so that his girlfriend would not miss it. *See* 244 F.3d at 1042–43. The government had originally given notice that the flight captain would testify but instead presented lay testimony from the first officer to show that the bomb threat endangered the

aircraft's safety. *See id.* at 1043, 1047. On appeal, the defendant argued that the first officer was an undisclosed expert witness and that admitting his testimony made the trial unfair. *See id.* at 1046. We found that "the government had given notice that the captain of the flight would testify to emergency procedures, what occurred on [the flight], and endangerment," and "[f]or the purposes of a fair trial it was immaterial that the captain was not available, and that an equally qualified witness who had experienced the same factual circumstances, was substituted." *Id.* Unlike Nelson, the defendant in *Mendoza* had been given notice of the challenged testimony and its basis before trial and could prepare.

In *Figueroa-Lopez*, a special agent with the Drug Enforcement Administration testified about "the means utilized by drug traffickers to detect certain things, . . . and their patterns and other activities." *Figueroa-Lopez*, 125 F.3d at 1247. The officer did not rely on hearsay statements made by unidentified traffickers or others, taken as true. The record contained extensive evidence of the officer's training and experience in drug traffickers' methods, a common subject of expert opinion. *Id.* The record in this case, by contrast, provides less support to find Agler qualified as an expert or that his opinions were reliable, and what telemarketers "know" is not a common subject for Rule 702 expert testimony. The record does not present a basis to excuse the failure to provide the defense timely notice of Agler's Rule 702 expert testimony by holding it admissible as lay opinion testimony under Rule 701.

We consider below whether this error and others were harmless in light of the extensive evidence that was properly admitted.[9]

### c.  The Rule 404(b) Evidence

Nelson testified that he believed Cinamour was a legitimate company, that he never knowingly lied to an investor, and that he would not have worked at Cinamour had he known about the false representations made by others working there.  On cross-examination, the government introduced evidence that shortly after law-enforcement agents raided Cinamour,  Nelson went to work in a movie telemarketing boiler room for Big Gunn Productions.  During his employment there, Nelson received a check from Slanaker with the notation for "leads."  The government offered the evidence of Nelson's subsequent employment as a telemarketer for Big Gunn Productions,[10] his work there with Slanaker, and the check from Slanaker, as evidence of subsequent bad acts under Federal Rule of Evidence 404(b).  Outside the jury's presence, the district court found that the evidence was admissible.  The court found that the evidence

---

[9] When we find evidentiary error, we typically review for harmlessness before considering other issues, reversing "only if such nonconstitutional error more likely than not affected the verdict."  *United States v. Tran*, 568 F.3d 1156, 1162 (9th Cir. 2009).  But "[w]here, as here, there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant."  *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)).

[10] Big Gunn was previously known as First Take Productions.

showing that Nelson subsequently worked in a similar boiler room doing very similar work tended to disprove his testimony that he did not know Cinamour's fundraising efforts were fraudulent.  The court reasoned that the subsequent employment occurred shortly after the events at issue, involved acts similar to the offense charged, and so supported finding that Nelson had committed the uncharged acts.  The court concluded that the evidence was "highly probative of [] Nelson's intent and knowledge, and any prejudice [could] be mitigated through the agreed-upon jury instruction."

Evidence of a subsequent bad act is admissible under Rule 404(b) to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b); *see also United States v. Hinostroza*, 297 F.3d 924, 928 (9th Cir. 2002) ("[O]ur precedent has squarely resolved in the government's favor the issue that subsequent Rule 404(b) evidence may be relevant and admissible." (citing *United States v. Bibo-Rodriguez*, 922 F.2d 1398, 1400 (9th Cir. 1991)).  The government must show that "(1) the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in certain cases) the act is similar to the offense charged."  *United States v. Ramos-Atondo*, 732 F.3d 1113, 1123 (9th Cir. 2013) (internal quotation marks omitted).  "[T]he probative value of the evidence must not be 'substantially outweighed by the danger of unfair prejudice.'"  *Blitz*, 151 F.3d at 1008 (quoting Fed. R. Evid. 403).

Nelson does not dispute that he began working at Big Gunn less than a year after the FBI raided Cinamour or that

he received the check from Slanaker 19 months after the raid. He argues that the government failed to show that Big Gunn was fraudulent or that it hired telemarketers to sell fraudulent or unregistered securities, that he made fraudulent misrepresentations while working for Big Gunn, or that Slanaker paid him for leads. At trial, Nelson testified that he left Big Gunn after he learned that the company was changing the movie's scheduled distribution date, because FBI agents had told him after the Cinamour raid that Cinamour had done the same thing.

Nelson's Big Gunn employment and the check he received from Slanaker were "not too remote in time," *see Johnson*, 132 F.3d at 1282, and were "introduced to disprove [Nelson's] claim that he did not know [Cinamour] was a fraud," *Blitz*, 151 F.3d at 1008. But the record does not show "sufficient evidence from which the jury could conclude that [Nelson] was involved in fraudulent telemarketing at [Big Gunn]" to justify admission under Rule 404(b). *Blitz*, 151 F.3d at 1008. The government points to a Form 302 report of an FBI agent's interview with a telemarketer, Amanda Payne, who overlapped with Nelson at Big Gunn.[11] Payne called investors from lead lists to raise money for a movie called *Baby O*, using a script stating that investments in the film would return three to five times the amount invested and omitting any reference to using invested funds to pay the fundraisers. Payne also worked as a secretary,

---

[11] After FBI agents conduct a formal interview, they "incorporate[]" their handwritten notes "into a more complete report of the interview on the FBI's Interview Report Form FD-302," known colloquially as a "302." *See United States v. Harris*, 543 F.2d 1247, 1249 (9th Cir. 1976); *see also United States v. Rewald*, 889 F.2d 836, 866 (9th Cir. 1989) ("A 302 report is an FBI agent's formal account of a witness interview filed on the FBI's Interview Report Form FD–302.").

fielding investor follow-up calls, purchasing leads, and doing accounting work. She told the agents that of the 10 to 20 investors she spoke with daily, only a few were disgruntled and most wanted an update on *Baby O*'s status. Although Payne testified that she would not recommend that her mother invest in the movie, that was because of some production problems. She would be comfortable having her mother invest in other Big Gunn productions under the right circumstances. Payne told the agents that she did not think that investors had been misled and that those closers who had lied to investors no longer worked for the company. She also told the FBI that Big Gunn's president had stopped taking a salary and had sold personal property to help cover overhead and maximize returns to investors. Payne told the FBI that Slanaker and Nelson worked for Big Gunn for only "a few months." By the time Nelson joined Big Gunn, *Baby O* was already completed and his fundraising work on the movie was limited. The district court repeatedly, and correctly, noted that the Payne interview did not show that Big Gunn was fraudulent. ("Amanda Payne, the problem with her 302 is she concludes by saying that she didn't believe that any of the investors of Big Gun[n] were misled."); ("I don't have the evidence in front of me, that there was something fraudulent about the—about the *Baby-O* raise. I don't seem to have that in my notes."); ("I need some better evidence that it was a boiler room and that there was a raise going on for *Baby-O*.").

The government also points to a Form 302 report of the FBI's interview with Leigh Clark, who invested $120,000 in *Baby O* after investing $100,000 in another Big Gunn film. Clark had Nelson's name and contact information on a note in his Big Gunn files, but he could not recall whether he actually spoke with Nelson. To the contrary, Clark thought he talked to someone named "Arnold," not Nelson, before he

invested, and Big Gunn's records showed that "Gary/Bart/Dave" closed Clark's investment. Clark did not state that Nelson made any misrepresentations to him or that Big Gunn's solicitation was fraudulent.

Similarly, apart from the check Nelson received from Slanaker with the word "leads" written in the memo line, there was no evidence that Nelson provided Slanaker with leads at Cinamour or at Big Gunn. According to Nelson, the check was to repay a long-outstanding loan. Nelson testified that he wrote the word "leads" in the check at Slanaker's request. When the district court asked the government outside the jury's presence what evidence "other than the existence of the check" showed that Nelson sold Slanaker leads, the government cited "[t]he fact that Slanaker was engaged in unlawful telemarketing, so leads would be an extremely appropriate thing for him to be buying." No evidence showed that Nelson had the means or the ability to generate a lead list.[12] The evidence did not show that Nelson supplied Slanaker or others with leads at Cinamour or Big Gunn.

---

[12] The government responds with an argument that it never made to the district court: the check was admissible to rebut Nelson's purported testimony that he would never be dishonest because it shows he was willing to lie and write "leads" on the check at Slanaker's behest. *See Blitz*, 151 F.3d at 1008 ("[W]hen the evidence of other acts is offered to prove knowledge, the other acts need not be similar to the charged acts as long as they tend to make the existence of the defendant's knowledge more probable than it would be without the evidence."). But Nelson did not testify that he would never be dishonest in his personal dealings. Instead, he testified that he would not lie in the course of his employment, whether to a customer or to an investor. And in any event, the risk of unfair prejudice of submitting the check to the jury substantially outweighed its minimal relevance to impeaching Nelson's claims of honesty.

The government argues that "if [the Big Gunn] scheme was indeed legitimate, [Nelson] cannot assert that it prejudiced the jury, or that it was inadmissible evidence of other bad acts." *Melvin*, 91 F.3d at 1222; *see also Blitz*, 151 F.3d at 1008. But in neither *Melvin* nor *Blitz* did the prosecution introduce lay or expert testimony and argue that all companies engaging in a type of business similar to the charged scheme were fraudulent. *See id.* In *Melvin,* the defendant "himself introduced the evidence relating to the [other acts] scheme, in order to highlight its legitimacy as compared to the [charged] schemes." 91 F.3d at 1222 n.2. And in *Blitz*, "the government presented substantial evidence to establish that the [the business where the uncharged conduct occurred] was engaged in fraudulent telemarketing." 151 F.3d at 1008. It was a "typical scam" in which "victims were told that they were 'guaranteed winners' of a big prize," which they would never receive, "but also were told that in order to quality for it, they had to buy a product, such as cosmetics, perfumes, pens or pencils" and "[t]hose products were sold at grossly inflated prices ranging from $250 to a couple of thousand dollars." *Id*. The defendant "conceded that he sold pen sets, vitamins, and makeup for $299 to $999," that "he never heard of a customer who got one of the promised large prizes," and that his prior work included "trying to get money back for people who felt that they had been defrauded by [the other company]." *Id.*

Unlike the record in *Melvin* and *Blitz*, which included specific evidence showing the fraudulent nature of the uncharged scheme, the government here relied heavily on lay opinion testimony based on statements by unidentified telemarketers to show that *all* movie telemarketing operations are fraudulent. The government then used that conclusion as evidence that Big Gunn's telemarketing was fraudulent.

When cross-examining Nelson about his telemarketing work for Big Gunn, the prosecutor asked if it was "[j]ust as crooked as Cinamour, just as crooked as all the movie boiler rooms that Mr. Allen Agler told us about, correct?" During closing arguments, the prosecutor told the jury that the "clearest evidence" that Nelson intended to defraud investors at Cinamour was that he went to work at another "movie investment boiler room" shortly after the FBI raided Cinamour's offices. The prosecutor argued that if the jury believed Nelson's testimony that the check was for a loan repayment, then Nelson "accepted money from a fraudulent company that was telemarketing and raising money from investors." Finally, the government told the jury that Slanaker, who took Nelson to Big Gunn, was a "convicted felon in a [prior] movie boiler room case."

We conclude that the district court abused its discretion in admitting this evidence of Nelson's subsequent employment at Big Gunn. We consider below whether this error was harmless. *See Frederick*, 78 F.3d at 1381.

### d. The Testimony About Nelson's Involvement in the Conference Calls "Reloading" Prior Investors

Nelson asserts that the district court committed reversible error in admitting Stephanie Alarcon's testimony about conference calls encouraging victims to reload. Alarcon testified not only about reloading conference calls she participated in, but also about conference calls Nelson participated in, even though she was not on those calls or in the room when they occurred. Her information came from what another telemarketer, Verna Capelli, then working as one of the closers, told her about conference calls that she

was on with Nelson and Slanaker.  Nelson raised a hearsay objection at trial.  We review the district court's ruling for an abuse of discretion.  *See United States v. Orm Hieng*, 679 F.3d 1131, 1141 (9th Cir. 2012).

Alarcon's testimony about what Capelli told her is not hearsay if both Capelli and Alarcon were coconspirators of Nelson's and the statement was offered against him.  "A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." *Bourjaily v. United States*, 483 U.S. 171, 173 (1987); *accord* Fed. R. Evid. 801(d)(2)(E).  Nelson argues that Alarcon was not his coconspirator because after the FBI and the U.S. Attorney's Office were involved, "the case agent and prosecutors told Alarcon that she was not in trouble and did not have to worry about being arrested."  Nelson cites no authority for his argument, and our cases provide no support.  "It is not necessary that the statement be made to another member of the conspiracy for it to come under [R]ule 801(d)(2)(E)," *United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993), and "[a] coconspirator's statement is admissible upon proof that it was made in furtherance of a conspiracy," even if "the indictment does not contain a conspiracy count" against that coconspirator, *United States v. Manning*, 56 F.3d 1188, 1197 (9th Cir. 1995).  "The question is merely whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture." *Manning*, 56 F.3d at 1197.

Both Capelli and Alarcon were working at Cinamour when Capelli took part in the calls with Nelson and described them to Alarcon.  Both Alarcon and Capelli  worked as fronters, and Capelli also worked as a  closer.  Their work as

fronters enabled closers, like Nelson, to get potential investors to sign and return the investment agreements to Cinamour with the checks. There is ample evidence that both Alarcon and Capelli were Nelson's coconspirators when Capelli and Nelson took part in reloading conference calls and when Capelli told Alarcon about Nelson's participation in the calls.

The record also supports finding that Capelli's statements kept Alarcon "abreast of an ongoing conspiracy's activities" and were therefore made "in furtherance of" the conspiracy. *See United States v. Yarbrough*, 852 F.2d 1522, 1536 (9th Cir. 1988). For example, Capelli told Alarcon about the participants in, and the substance of, the conference calls in which she took part. Capelli explained the strategy behind the conference calls: to "get all the investors together" so that if one decided to invest, the others would be more likely to follow suit "because [of] their egos." And Capelli warned Alarcon that she thought the calls were not "a good idea" and that if the FBI was recording them, the company would be shut down. Although "[m]ere conversations between coconspirators, or merely narrative declarations among them, are not made 'in furtherance' of a conspiracy," the evidence is sufficient to find by a preponderance that Capelli's statements "were made with the intent to keep [Alarcon] abreast of what [Cinamour] had done, was doing, or would do in the future." *See id.* at 1535–36.

The district court did not abuse its discretion in admitting Alarcon's testimony about Nelson's participation in reloading conference calls.

### e. The Email Evidence About Baker

Baker asserts that the district court erred in admitting an email containing hearsay statements that he had been warned to stop giving potential investors false information about the investments. The email was admitted during the government's examination of Jennifer Nakamori, Cinamour's Los Angeles office manager during the time Baker worked for that office. Nakamori wrote the email to Glen Hartford in August 2002. It included the following statements:

> Paul [Baker] brings in money because he's giving investors false information. We've given him 5 warning[s] already and he still can't get it right. . . . You [Hartford] are the one who told me that Paul [Baker] would be let go after one more warning. You told me this morning that we are accepting money from investors who've been given false promises. It sounds like we're just taking money from anyone. How can we make a movie this way? What's going to happen in the future? They may come back and you will be held liable. Paul, Evan, Matt, and everyone else will just walk away happy with their commission monies in their pockets.

Nakamori's information that Baker gave potential investors and victims false information came only from "[t]hings I heard in the office" and was "[j]ust rumors that I heard." Nakamori could not remember who said the "things" or spread the "rumors." Hartford told her that he had warned Baker not to give false information or make false promises

about the investments. Nakamori  could not remember hearing Hartford warn Baker.

Baker objected to the email and Nakamori's testimony about it. His objection was overruled and the email and related testimony were admitted. Baker renews his objection on appeal. We find an abuse of discretion in admitting the email and related testimony. Nakamori had no personal knowledge about whether Baker was making false statements to get victims to invest. Nor did she have personal knowledge about whether Baker had been repeatedly warned not to do this.

The government argues that the email and Nakamori's testimony about it are admissible because they were offered to show Baker's state of mind—his knowledge that what he was telling investors was false—rather than for the truth of the matter stated. The problem is that unless the email contents and related testimony were true, they are not relevant to show Baker's state of mind. The email does not show that Baker knew he was making false representations unless the statements that he was doing so and had been warned about it are accepted as true. The evidence was hearsay.

We consider below whether the error was harmless in light of the other evidence properly submitted to the jury. *See Frederick*, 78 F.3d at 1381.

### f. Nelson's Proffered Testimony About His Daughter's Birth

Nelson argues that the district court erred in excluding his testimony about his daughter's birth and the role it played in motivating him to stay sober, law-abiding, and employed.

Nelson argues that he followed Slanaker's instructions not because he intended to violate the law, but because he was determined to keep his  job.  In his opening statement, Nelson's counsel stated:

> [B]ehind [an] alcohol soaked haze, behind [a] dumpster, [Nelson] realized that he was about to be a father.  He realized that his girlfriend was about to give birth to his daughter. . . . [he found out] that his girlfriend [was] going to give the baby up for adoption [and that] he's going to lose his parental rights, and there is something that he can do about that, and he does something about that.  He was unable to contest the adoption, but he [was] able to somehow retain his parental rights.

The next day, a juror asked to be excused because he "might have a problem being completely objective in regards to the prosecution's case against [Nelson] because of the far-reaching ramifications [another prosecution] had on my own family."  The juror remained as an alternate, but the government asked the district court for a limine order excluding evidence about the birth of Nelson's daughter.  The government argued that this evidence was intended only to elicit sympathy, was irrelevant to the legal and factual issues before the jury, and would encourage jury nullification.  Nelson responded that the evidence was relevant to show his lack of mens rea.

The court denied the government's limine request in part and granted it in part, allowing Nelson to testify about his history of alcoholism, homelessness, and joblessness.  The court allowed Nelson to testify that during this period, "some

things [were] happening" that motivated him to become and stay sober, out of jail, and employed. The court refused to let Nelson identify those "things" or provide details. The court reasoned that the evidence about Nelson becoming a father and achieving a relationship with his daughter was "designed to improperly appeal to the sympathy of the jury," and concluded that "the probative value is substantially outweighed by the risks of unfair prejudice."

Nelson argues that the court's ruling prevented him from presenting a complete and meaningful defense, violating the Due Process Clause, *see California v. Trombetta*, 467 U.S. 479, 485 (1984), and Federal Rule of Evidence 401. Nelson contends that this testimony was crucial to explain his "history and state of mind in the time period leading up to his employment at Cinamour." We disagree.

As the experience with the juror who remained as the alternate demonstrates, this testimony carried a high risk of evoking an emotional response. The jury heard undisputed evidence that Nelson stayed sober, out of jail, and employed throughout his time at Cinamour. The jury also heard undisputed testimony that Nelson was so determined to keep his job at Cinamour that he continued to work despite the abuse he took from Slanaker. Given the testimony the jury did hear, the additional testimony about the birth of Nelson's daughter was only marginally relevant to show his mens rea and was cumulative of other evidence. Because the prejudicial impact outweighed the probative value, the district court did not abuse its discretion in excluding this testimony.

## 2.  The Jury Instructions

### a.  Baker's  Claim  that  the  Instructions Constructively Amended the Indictment

"A constructive amendment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or a court after the grand jury has last passed upon them." *United States v. Ward*, 747 F.3d 1184, 1190 (9th Cir. 2014) (internal quotation marks omitted).  The mail- and wire-fraud counts alleged that Baker "knowingly and with the intent to defraud" participated in and executed a scheme "to obtain money from [] investors by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts."

The district court instructed the jury that

> [a] statement or representation is "false or fraudulent" for purposes of mail and wire fraud if known to be untrue, or made *with reckless disregard* as to its truth or falsity, and made or caused to be made with the intent to deceive.

The court gave a similar instruction on Baker's good-faith defense:

> The defendant does not have the burden of proving he acted in good faith.   The government must prove beyond a reasonable doubt that the defendant acted with the intent to defraud and did not act in good faith.  Proof that a defendant acted *with reckless disregard*

as to the truth or falsity of material misrepresentations he may have made is inconsistent with good faith.

Baker argues that the district court constructively amended the indictment by using the term "reckless disregard," which permitted the jury to convict on a lesser mental state than "knowing."

When a defendant makes a constructive-amendment objection at trial, our review is de novo. *Ward*, 747 F.3d at 1190. The government argues that plain-error review applies because although Baker objected to the instruction, it was on the basis of an improper variance, not a constructive amendment. Our precedent does not support the government's argument. In *Ward*, we reviewed the defendant's constructive-amendment argument on appeal de novo despite his failure to use specific words, including "the term 'Fifth Amendment,'" when he objected at trial. We reasoned that "the substance of the objection"—the fear that the jury would convict on the basis of conduct not alleged in the indictment—"was patently clear." 747 F.3d at 1189. Similarly, although Baker did not use the words "constructive amendment" in objecting, he did state that "the government in no way alleged a theory of reckless indifference as a mental state on any defendant's part in the indictment." The substance of Baker's objection was clear. Our review is de novo.

"[A] constructive amendment occurs when 'the crime charged [is] substantially changed at trial, so that it [is] impossible to know whether the grand jury would have indicted for the crime actually proved.'" *United States v. Pisello*, 877 F.2d 762, 765 (9th Cir. 1989) (quoting *United*

*States v. Von Stoll*, 726 F.2d 584, 586 (9th Cir. 1984)). In *United States v. Love*, 535 F.2d 1152 (9th Cir. 1976), "the indictment charged [the defendant] with certain fraudulent representations while 'well knowing' that the representations were falsely made." *Id.* at 1157. The defendant appealed, arguing that the district court impermissibly varied from the indictment by instructing the jury that

> [a] statement or representation is false and fraudulent within the meaning of the statute if known to be untrue or made *with reckless indifference* as to its truth or falsity and made or caused to be made with the intent to deceive.

*Id.* (emphasis added). Applying de novo review, the court rejected the argument, reasoning that in a mail-fraud prosecution, "'[o]ne who acts with reckless indifference as to whether a representation is true or false is chargeable as if he had knowledge of its falsity.'" *Id.* at 1158 (quoting *Irwin v. United States*, 338 F.2d 770, 774 (9th Cir. 1964)).[13]

The instruction at issue here was clearer than the instruction in *Love* in that it required the jury to find the statement "known to be untrue, or made with reckless disregard as to its truth or falsity, *and* made or caused to be made with the intent to deceive." An indictment charging that a defendant knowingly participated in a scheme to defraud does not necessarily charge that defendant with making specific false statements. *See United States v. Woods*,

---

[13] Although *Love* was a variance challenge, courts have applied its reasoning to constructive-amendment challenges similar to Baker's. *See United States v. Hathaway*, 798 F.2d 902, 911 (6th Cir. 1986).

335 F.3d 993, 999 (9th Cir. 2003) ("[A] scheme to defraud . . . may or may not involve any specific false statements.").

We conclude that the district court's instruction did not constructively amend the indictment.

### b. Nelson's Claim that the District Court Erred in Rejecting His Definition of "Reckless Disregard"

Nelson argues that the district court erred by not including his timely submitted instruction defining reckless indifference. "In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Dixon*, 201 F.3d 1223, 1230 (9th Cir. 2000). "A single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Id.* De novo review applies to determining "whether the district court's instructions adequately presented the defendant's theory of the case" or "misstate[] the elements of a statutory crime." *Id.*; *United States v. Frega*, 179 F.3d 793, 807 n.16 (9th Cir. 1999). Review for abuse of discretion applies to the district court's "precise formulation" of the instructions. *Dixon*, 201 F.3d at 1230 (quoting *United States v. Knapp*, 120 F.3d 928, 930 (9th Cir. 1997)).

Nelson asked the court to instruct the jury that

> a person acts with reckless indifference as used in these instructions if he consciously disregards a substantial and unjustifiable risk that his statements are false or misleading—that is, if he deliberately closes

his eyes to what would otherwise have been obvious to him. The government has the burden of showing reckless indifference beyond a reasonable doubt.

The district court instead told the jury that

[a] statement or representation is "false or fraudulent" for purposes of mail and wire fraud if known to be untrue, or made with reckless disregard as to its truth or falsity, and made or caused to be made with the intent to deceive.

The court did not define "reckless disregard."

Nelson contends that the district court erred in failing to include the deliberate-blindness or deliberate-ignorance instruction he submitted because leaving the meaning to lay understanding could lead the jury to convict based on negligence. We have repeatedly held that similar "reckless indifference" or "reckless disregard" instructions sufficiently protect against this risk. *See, e.g.*, *United States v. Munoz*, 233 F.3d 1117, 1135–36 (9th Cir. 2000), *superseded by statute on other grounds*, 18 U.S.C. § 1341; *United States v. Gay*, 967 F.2d 322, 326–27 (9th Cir. 1992). Recklessness in this context is "within the comprehension of the average juror" and needs no special definition. *United States v. Tirouda*, 394 F.3d 683, 688–89 (9th Cir. 2005) ("'[C]riminal recklessness under Alaska law relates essentially to the common-sense definition of recklessness, which the average juror could understand and apply without an instruction.'") (quoting *Walker v. Endell*, 850 F.2d 470, 475 (9th Cir. 1987)).

The court's instructions, considered as a whole, clearly told jurors that they could not convict Nelson unless they unanimously found that the government had proven beyond a reasonable doubt that he acted with intent to defraud—the intent to deceive or cheat—and did not act in good faith. The instructions told the jury that they could not convict on the basis of negligence.

We find no basis for reversal on this ground.

### c. Nelson's Claim that the District Court Erred in Instructing on the Alleged Securities-Law Violations

Nelson argues that the district court erred in instructing the jury on the counts alleging that he violated 15 U.S.C. § 77e, which forbids the offer or sale of unregistered securities, and § 77x, which punishes "willful[]" violations of the securities laws.

### i. The Instruction on Aiding or Abetting the Offer or Sale of Unregistered Securities

The parties agreed to, and the court gave, the following instruction on15 U.S.C. § 77e and 18 U.S.C. § 2:

> In order for a defendant to be found guilty of the illegal sale or distribution of unregistered securities as charged in the Indictment, the government must prove each of the following elements beyond a reasonable doubt:
>
>> First, that the securities which the defendant sold were not registered with

the [S]ecurities and Exchange Commission;

Second, that the securities sold were required to be registered with the Securities and Exchange Commission—that is, that the transactions were not exempt from registration;

Third, that, knowing the securities were not registered and not exempt, the defendant willfully sold or caused them to be sold to the public; and

Fourth, that the defendant used or caused to be used the mails or the means and instrumentalities of interstate commerce to sell the securities.

Nelson contends that this instruction failed to convey the government's burden  to prove that he knew that the unregistered securities he was selling had to be registered. Nelson contends that it was not enough for the government to prove his knowledge that the securities were not exempt from the registration requirement.  Because Nelson agreed to the instruction without objection, plain-error review applies. *See United States v. Feldman*, 853 F.2d 648, 652 (9th Cir. 1988).

Nelson cites no authority for his argument, and we have found none.  In context, the difference between knowing that the law required registering the securities in order to sell them and knowing that the unregistered securities were not exempt from the registration requirement is not material.  We find no reversible error.

### ii. The Instruction on Willfully Violating the Federal Securities Laws

The court gave the following instruction of "willfully" in instructing the jury on the alleged 15 U.S.C. § 77x violation:

> A person acts "willfully" under the federal securities laws by intentionally undertaking an act that one knows to be wrongful. "Willfully" does not require that the person know specifically that the conduct was unlawful.

Nelson renews the objection he made at trial that the instruction would allow conviction without proof that he knew his conduct violated the securities laws. He contends that because 15 U.S.C. § 77e forbids offering or selling unregistered securities, which is not inherently wrongful, this proof is required to show a "willful[]" violation of 15 U.S.C. § 77x.

We rejected a similar argument in *United States v. Reyes*, 577 F.3d 1069 (9th Cir. 2009), an appeal from a conviction for knowingly falsifying "book[s], record[s], and account[s]," in violation of 15 U.S.C. § 78m(b)(5). The defendant argued that because "the knowing falsification of books, records, and accounts is not 'inevitably nefarious,'" she could not be convicted without proof that she knew her conduct violated the law. *Id.* at 1080. We held that her argument was "foreclosed" by *United States v. Tarallo*, 380 F.3d 1174 (9th Cir. 2004), and other cases "reject[ing] the argument that, in the context of the securities fraud statutes, willfulness requires a defendant know that he or she was breaking the law." *Reyes*, 577 F.3d at 1080 (citing *Tarallo*, 380 F.3d at

1187–88; *United States v. Charnay*, 537 F.2d 341, 351–52 (9th Cir. 1976)). The district court "correctly instructed the jury that it had to find that" the defendant "was aware of the falsification and did not falsify through ignorance, mistake, or accident," but "[t]here is no higher standard for a willful violation of the securities laws." *Id.* (quotation marks omitted).

Nelson attempts to distinguish *Reyes* by arguing that it involved "securities fraud" under § 78m, not "regulatory violations" under § 77e that are not "inherently bad acts." But both § 78m and § 77e use the scienter standard under 15 U.S.C. § 77x, which allows conviction if a person "willfully violates" the securities laws. There is no basis in the statutory language or in our cases to read a higher level of scienter into § 77x when the alleged violation is under § 77e. The district court did not commit reversible error in instructing the jury on the counts alleging that Nelson violated the securities laws.

### d.  The Rule 404(b) Instruction

Nelson argues, without citing authority, that the district court erred in instructing the jury on the Rule 404(b) evidence of his telemarketing work at Big Gunn after the FBI raided the Cinamour office where he worked. Although we find it error to  admit the evidence, we find no error in the instruction, which tracked the Ninth Circuit model jury instruction for Rule 404(b) evidence:

> You have heard the evidence that defendant Nelson committed other acts not charged here. You may consider this evidence for its bearing, if any, on the question of defendant

Nelson's intent, knowledge, absence of mistake and absence of accident and for no other purpose. You may not consider this evidence against any other defendant on trial.

*See* Ninth Cir. Crim. Model Jury Instructions § 4.3 (2010 ed.).

According to Nelson, the language "not charged here" implies that the  uncharged acts could have been charged. We find that the instruction, considered as a whole, accurately and clearly stated the law. We have recently cited this model instruction with approval. *United States v. Hardick*, 766 F.3d 1051, 1054, 1056 (9th Cir. 2014) (the district court did not abuse its discretion in admitting Rule 404(b) evidence in part because the court "gave a limiting instruction at the close of evidence" describing "'other acts not charged here'" that mirrored the "legally correct model instruction."). The district court did not abuse its discretion in giving the Rule 404(b) instruction.

### 3.  Nelson's Claim of Prosecutorial Misconduct

Nelson asserts that the prosecutor's statements about the victims' testimony, made in closing argument, requires reversal.  "To obtain a reversal based on prosecutorial misconduct, [Nelson] must establish both misconduct and prejudice." *United States v. Wright*, 625 F.3d 583, 609–10 (9th Cir. 2010), *superseded by statute on other grounds as recognized by United States v. Brown*, 785 F.3d 1337, 1351 (9th Cir. 2015).  Nelson did not "object[] at trial to acts of alleged prosecutorial misconduct."  Our review is for plain error. *See United States v. Hinton*, 31 F.3d 817, 824 (9th Cir. 1994).

Nelson argues that the prosecutor intentionally misstated the testimony Melvin Bitikofer gave at trial. Bitikofer testified that Slanaker, not Nelson, asked him to participate in the February 2009 reloading conference call in which he was persuaded to invest another $100,000 in a Cinamour movie, this time using money from his wife's IRA. Bitikofer testified that he did not know if Nelson was on the call or not. During closing, however, the prosecutor told the jury that Nelson "got Mr. Bitikofer on a conference call—look at Exhibit 289—and he took a hundred thousand dollars more." The prosecutor also incorrectly attributed to Melvin Bitikofer the testimony given by another victim, Richard Clark, that "Mr. Nelson told [him] that he wasn't just a salesman, but was also involved in the technology aspect of the company as well."

The government concedes that the prosecutor's closing argument contained both statements and that both were wrong. Our review of the record shows no basis for finding that the prosecutor's errors were intentionally made or that they substantially affected Nelson's right to a fair trial. The prosecution accurately described the testimony about the reloading conference call but inaccurately attributed the call to Nelson rather than Slanaker. There was no error in the prosecutor's description of what the victim-witness said, only that Clark, not Bitikofer, was the victim who said it. In context, these mistakes appear to have been inadvertent.

A prosecutor's inadvertent mistakes or misstatements are not misconduct. *See United States v. Del-Toro Barboza*, 673 F.3d 1136, 1153 (9th Cir. 2012) (a prosecutor's attribution of one defendant's statement to both defendants was "an honest mistake and not prosecutorial misconduct"); *Downs v. Hoyt*, 232 F.3d 1031, 1038 (9th Cir. 2000) (a

prosecutor's passing reference to a statement not in evidence was not misconduct when the prosecutor was "confused about which portions of the voluminous medical records had been admitted into evidence"); *United States v. Carrillo*, 16 F.3d 1046, 1050 (9th Cir. 1994) (a prosecutor's "misstatement ha[d] earmarks of inadvertent mistake, not misconduct").

Nor were the misstatements "so gross as probably to prejudice" Nelson. *United States v. Navarro*, 608 F.3d 529, 536 (9th Cir. 2011). That is particularly so in light of Clark's testimony that Nelson played a substantial role in his conference call and the district court's repeated instructions that the jury's recollections—not the prosecutor's summation—controlled.

The prosecutor's misstatements during closing are not a basis for reversal.

### 4. Cumulative Error

"Even if no error individually supports reversal, the cumulative effect of numerous errors may support reversal." *United States v. Inzunza*, 638 F.3d 1006, 1024 (9th Cir. 2009) (citing *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996)). "Where, as here, there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir. 1988)). "In those cases where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." *Id.* "This is simply the logical corollary of the harmless error doctrine

which requires us to affirm a conviction if there is overwhelming evidence of guilt." *Id.* (internal quotation marks omitted).

### a. Baker

Although the district judge erred in admitting Agler's lay opinion testimony about what telemarketers know and intend, and in admitting the Nakamori email and related testimony, the errors were harmless in light of the overwhelming evidence against Baker. The evidence included voice recordings of Baker's calls with an undercover agent posing as a potential investor in *Red Water.* In the calls, Baker repeatedly lied. He told the agent that Cinamour had already secured $5.4 million presales contracts to distribute the film in 31 countries, guaranteeing a risk-free and profitable investment. He told the agent that there was already enough revenue from the presale contracts to guarantee a 110 percent return to the investors. He told the agent that investors would receive the 110 percent return in 8 to 10 months and triple their money in 2 years. He told the agent that the film's promoters and sales personnel would receive no money until the investors had received their money back with a profit, and that none of the fundraisers were receiving commissions. Baker's victims testified that he made the same statements to them. Baker's coconspirators testified about his false statements and role in the conspiracy, including his role in including false statements about commissions in the *Red Water* private placement memorandum. Finally, the jury heard that after the raid, Baker confessed to law-enforcement agents that he had lied in the call with the undercover agent about the presale contracts and the commissions.

In light of the overwhelming admissible evidence against him, the errors we have found do not require reversing Baker's conviction. *See United States v. Ruiz*, 710 F.3d 1077, 1080 n.1 (9th Cir. 2013) ("Finally, since the errors that occurred at trial were isolated, reversal for cumulative error is not warranted."). Baker's conviction is affirmed.

### b. Nelson

There was certainly evidence against Nelson, but it was not overwhelming. Nelson's victims testified that he too misrepresented the existence of presale distribution contracts, the resulting profit guarantee and the absence of risk, and the absence of commissions or other payments to promoters and sales personnel. Although Nelson denied these allegations at trial, he admitted using a script with those statements. Nelson also sent an email to one victim, Eliassen, promising that presales distribution contracts made the investment secure. Nelson testified that some unidentified person at Cinamour had told him at some unidentified time that the presales contracts described in the script did exist. Nelson told his victims that investors in Cinamour's prior movies had been successful even though his coconspirator, Stephanie Alarcon, testified that she and Nelson had talked about the fact that prior investors were unhappy because they had not made money. The evidence showed that Nelson told prospective investors and the victims who invested that filming on *Red Water* had begun or was about to begin. He admitted on the stand that filming had not started and was not about to start. Nelson testified that he did not reveal his 12.5 percent commission to the prospective investors or victims he talked to, and the evidence, including Nadav Shimoni's testimony and scripts, showed that Nelson was involved in the reloading conference calls.

There was also evidence favorable to Nelson's defense theory that he lacked the intent to defraud necessary to show that he willfully violated the securities laws. Nelson joined Cinamour much later than his codefendants, giving him less exposure to the fraudulent practices before the FBI's 2009 raid. He testified that he was only involved in a few reloading conference calls and then only for a brief period, and that he was unaware of the use of "shills" like Shimoni. Although we conclude that there was sufficient evidence to support each count of conviction, *see infra* Part II.C.5, the government has not met its burden to show that the evidentiary errors we have found were harmless. *United States v. Vizcarra-Martinez*, 66 F.3d 1006 (9th Cir. 1995) (evidence properly admitted was sufficient to support the conviction but the error in admitting evidence was not harmless, requiring reversal and remand). The inadmissible evidence of Nelson's subsequent employment at Big Gunn and the check he wrote to Slanaker, especially when refracted through the lens of Agler's testimony that all movie telemarketing operations are fraudulent and that all fronters and closers knew this, may have "substantially swayed" the jury in concluding that the government had met its burden of proving Nelson's knowledge and intent. *See Freeman*, 498 F.3d at 905.

The risk that the improperly admitted evidence affected the verdict is increased because the government's closing argument repeatedly encouraged the jury to rely on this evidence. The government argued during closing that Nelson, Baker, and Greenhouse "knew" that "there was no way these investors would ever make a dime" and that "they lied in order to get the people to invest their money." The government emphasized Allen Agler's testimony that "all the closers knew that no investor makes money from an

independent movie where the money is raised by cold call telemarketing." And the government told the jury that "the clearest evidence" that Nelson had the intent to defraud while working at Cinamour was that he went to work at another "movie investment boiler room"—Big Gunn—after the FBI raided Cinamour.

Our review of the record leaves us without a "fair assurance" that the "jury was not substantially swayed by the error[s]" in convicting Nelson. *See Freeman*, 498 F.3d at 905. We conclude that the errors were not harmless and that they require us to reverse Nelson's conviction, vacate his sentence, and remand.

## 5.  Nelson's Claim that the Evidence Is Insufficient to Sustain His Convictions

Nelson argues that the government presented insufficient evidence to convict him of violating 15 U.S.C. §§ 77e and 77x by selling unregistered securities.[14] We address this question even though we reverse the conviction and remand because a retrial may implicate double jeopardy. "'It has long been settled  . . . that the Double Jeopardy Clause's general prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction." *United States v. Preston*, 751 F.3d 1008, 1028 (9th Cir. 2014) (en banc) (quoting *Lockhart v. Nelson*, 488 U.S. 33, 38 (1988)). "But the Supreme Court has recognized an exception to the

---

[14] Nelson does not argue that the evidence was insufficient to support his convictions for conspiracy, mail fraud, or wire fraud.

government's right to retry a defendant without offending the Double Jeopardy Clause where the conviction is overturned for insufficient evidence." *Id.* (citing *Burks v. United States*, 437 U.S. 1, 11 (1978)). "This exception recognizes that the 'Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding.'" *Id.* (quoting *Burks*, 437 U.S. at 11). We "must address the sufficiency of the evidence question" on the securities-fraud convictions "even though we are remanding for a new trial." *Id.*

A "two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence" applies. *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc). "First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The reviewing court "may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." *Id.* "Rather, when faced with a record of historical facts that supports conflicting inferences," the reviewing court "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* (internal quotation marks omitted).

"Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow '*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting and emphasizing *Jackson*, 443 U.S. at 319). "More than a 'mere

modicum' of evidence is required to support a verdict." *Id.* (quoting *Jackson*, 443 U.S. at 320). "At this second step, however, a reviewing court may not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt, only whether 'any' rational trier of fact could have made that finding." *Id.* (internal quotation marks and citations omitted).

Nelson argues that the government failed to show that he had the required intent to violate § 77e and § 77x. He points to the statement in the private placement memorandum for *Red Water* that the partnership units were exempt from the registration requirement, and he argues that the evidence failed to show he "had any information to the contrary." The record undercuts his argument.

The evidence included a copy of the private placement memorandum found in Nelson's office. The memorandum clearly stated that "[n]o general solicitation or advertisement in any form may be utilized regarding the offering." The exhibit contained handwritten notes matching a sample of Nelson's known handwriting. A highlighted section discussing the registration exemption clearly stated that if a security was unregistered, solicitations and sales had to be limited to "accredited investors," and handwritten notes on an accompanying subscription document contained annotations about the meaning of that term. Stephanie Alarcon testified that Nelson told her what it meant for an investor to be accredited. There was ample evidence that Nelson knew and understood the accredited-investor limitation on soliciting and selling the unregistered securities and what being an accredited investor meant. There was also ample evidence that Nelson pursued the leads he was provided without any inquiry about whether the investors he successfully solicited

were accredited. The evidence showed that he sold units to investors who gave him information showing that they failed to meet the accreditation standards.

Viewing the evidence in the light most favorable to the government, a rational juror could conclude beyond a reasonable doubt that Nelson knew that the securities he was selling had to be registered unless he and others limited offers and sales to accredited investors, and that the investors he solicited—some successfully—included many who were clearly not accredited. The evidence was sufficient for the jury to convict Nelson for violating 15 U.S.C. §§ 77e and 77x.[15] Nelson may be retried on these counts, as well as on the counts he does not challenge on the basis of insufficient evidence, without violating the Double Jeopardy Clause.[16]

---

[15] Nelson's reliance on *United States v. Crosby*, 294 F.2d 928 (2d Cir. 1961), is unavailing. In that case, the defendants had opinion letters from attorneys stating that the securities they were selling through solicitations were exempt. *See id.* at 939–41. Nelson had no similar opinion or basis for believing that the securities he sold were exempt.

[16] Although we need not consider whether the evidence was sufficient to sustain Nelson's conspiracy, mail-fraud, and wire-fraud convictions because he does not raise that issue on appeal, we note that, viewing the evidence in the light most favorable to the government, a rational factfinder could find the essential elements of those crimes beyond a reasonable doubt.

### III.  Baker's Sentencing Challenge[17]

The district court calculated Baker's Guidelines range as 292 to 365 months, based on a total offense level of 35 and a criminal history category of VI, and sentenced him to serve a 194-month prison term and pay $12,043,678.25 in restitution.  Baker argues that the court committed procedural error in applying a two-level enhancement for targeting vulnerable victims and increasing his criminal history points based on two prior sentences.  The increase in points put him in criminal history category VI instead of V.

"Procedural errors include, but are not limited to, incorrectly calculating the Guidelines range, treating the Guidelines as mandatory, failing to properly consider the [18 U.S.C.] § 3553(a) factors, using clearly erroneous facts when calculating the Guidelines range or determining the sentence, and failing to provide an adequate explanation for the sentence imposed."  *United States v. Armstead*, 552 F.3d 769, 776 (9th Cir. 2008).  "We review the district court's interpretation of the [G]uidelines de novo," its "application of the [G]uidelines to the facts for an abuse of discretion," and "the substantive reasonableness of the sentence for an abuse

---

[17] Nelson also challenges his sentence, but because we reverse his convictions for selling unregistered securities, we need not address that challenge here.

of discretion."**[18]**   *United States v. Hurtado*, 760 F.3d 1065, 1068 (9th Cir. 2014).

## A.  The Vulnerable-Victim Enhancement

A two-level enhancement "applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability." U.S.S.G. § 3A1.1(b)(1), cmt. n.2.  A "vulnerable victim" is "a person . . . who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.*, cmt. n.2. We review the district court's "findings that the victims were vulnerable . . . for clear error." *United States v. Randall*, 162 F.3d 557, 560 (9th Cir. 1998).

Baker contends that the district court erred in applying the vulnerable-victim enhancement because targeting victims for reloading and successfully reloading them did not make them "vulnerable" under § 3A1.1(b)(1).  The district court correctly found, and we have twice held, that when, as here, a defendant "reloads" victims by soliciting more money from those who have already proven susceptible to an investment fraud, including in the telemarketing context, the vulnerable-victim enhancement is appropriate. *See, e.g.*, *United States v. Ciccone*, 219 F.3d 1078, 1086 (9th Cir. 2000) ("[V]ictims of a 'reloading' scheme . . . are vulnerable for the

---

**[18]** "There is an intracircuit split as to whether the standard of review for application of the Guidelines to the facts is de novo or abuse of discretion." *United States v. Tanke*, 743 F.3d 1296, 1306 (9th Cir. 2014). This issue is currently the subject of en banc review. *See United States v. Gasca-Ruiz*, No. 14-50342, 2015 WL 7067873 (9th Cir. Nov. 12, 2015) (mem.).  We would reach the same result under either standard.

purpose of enhancing a convicted person's sentence.");
*Randall*, 162 F.3d at 560 ("[W]hether these persons are
described as gullible, overly trusting, or just naive[,] their
readiness to fall for the telemarketing rip-off, not once but
twice[,] demonstrated that their personalities made them
vulnerable in a way and to a degree not typical of the general
population." (emphasis original)).

Not only does our precedent make clear that a reloaded
investor-victim of a telemarketing scheme is a vulnerable
victim, *see, e.g.*, *Ciccone*, 219 F.3d at 1086; *Randall*,
162 F.3d at 560, but the record also shows that Baker
intentionally targeted several of his investor-victims for
reloading because they had a "track record of falling for
fraudulent schemes," *Randall*, 162 F.3d at 560. The district
court specifically identified three individuals, Tranter,
Beacham and Houseknecht, as vulnerable victims. Baker
solicited investments from each for *Forbidden Warrior*. Five
years after Tranter's first investment in *Forbidden Warrior*,
Baker successfully reloaded him to invest in *Red Water*.
Baker tried to reload Beacham to invest in *From Mexico with
Love* a few years after convincing him to invest in *Forbidden
Warrior*. Although Baker did not initially succeed, his
efforts, combined with those of Lloyd and Agler, convinced
Beacham to make the additional investment. Beacham was
convinced in part because of Baker's representations that he
would soon see returns on his earlier investment in *Forbidden
Warrior*. Lloyd and Agler had already reloaded Houseknecht
when Baker later tried to reload her again, this time without
success. Baker received commissions for each successful
reloading, including Houseknecht's reloading by Lloyd and
Agler. The record amply supports the district court's
vulnerable-victim enhancement. There was no procedural
error.

## B.  The Claim of Error in Calculating Baker's Criminal History Category

Baker argues that the district court erred in calculating his criminal history by double-counting the sentences he received when his probation for two prior convictions was revoked.  In September 1990, Baker was arrested for forgery, grand theft, and passing bad checks.  In January 1991, while on bond for that offense, Baker was arrested for committing grand theft on five separate occasions.  On October 9, 1991, Baker was sentenced on both convictions.  In the September 1990 case, Baker was sentenced to serve six months on one count of forgery, to be followed by probation.  In the January 1991 case, Baker was sentenced to serve six months on one count of grand theft, to be followed by probation for two additional counts.  Baker served the custodial sentence, was released, and violated his probation.  In August 1992, his probation was revoked in both cases and he was sentenced to serve two 18-month prison terms, to run concurrently with each other and consecutively to his current term of incarceration.

The district court followed the presentence report's recommendation to increase Baker's criminal history score by six points for the sentences imposed in the September 1990 and January 1991 cases.  Baker objected that only three points should have been assessed for the two prior sentences.  He objects on appeal as well, but not for the reason he identified at sentencing.

At sentencing, Baker pointed to U.S.S.G. § 4A1.2(a)(2) to argue that the September 1990 and January 1991 sentences should have been treated as a single sentence.  Because the two sentences were separated by an intervening arrest, the district court reasoned that they counted as two separate

sentences under the Guidelines.  *See* U.S.S.G. § 4A1.2(a)(2) ("Prior sentences always are counted separately if the sentences were imposed for offenses that were separated by an intervening arrest . . . .").

On appeal, Baker argues that adding six rather than three criminal history points was incorrect under Application Note 11 to U.S.S.G. § 4A1.2(k).  The Note provides that "[w]here a revocation applies to multiple sentences, and such sentences are counted separately under § 4A1.2(a)(2), add the term of imprisonment imposed upon revocation to the sentence that will result in the greatest increase in criminal history points." U.S.S.G. § 4A1.2(k), cmt. n.11.  The Note gives the following example:

> A defendant was serving two probationary sentences, each counted separately under § 4A1.2(a)(2); probation was revoked on both sentences as a result of the same violation conduct; and the defendant was sentenced to a total of 45 days of imprisonment.  If one sentence had been a "straight" probationary sentence and the other had been a probationary sentence that had required service of 15 days of imprisonment, the revocation term of imprisonment (45 days) would be added to the probationary sentence that had the 15-day term of imprisonment.

*Id.*

"The effect of this application note would be to add the additional term of incarceration to only one of [the defendant's] first two disputed convictions." *United States v.*

*Flores*, 93 F.3d 587, 592 (9th Cir. 1996). Although "'the sentencing court can tack the probation revocation sentence to any one'" of the defendant's underlying sentences, the others would "'remain unaffected.'" *Id.* (quoting *United States v. Streat*, 22 F.3d 109, 111 (6th Cir. 1994)).

On appeal, the government concedes that "when multiple probationary sentences are revoked at the same time for the same violation conduct, only one of the new sentences imposed at the revocation hearing can be added to the underlying sentences for purposes of U.S.S.G. § 4A1.2(a)." If Note 11 applies, Baker argues that one of his prior sentences would be 24 months, consisting of 6 months for the original prison term, plus 18 months for the term imposed on revocation. The other prior sentence, Baker contends, would be limited to 6 months under Note 11. Because the revocation applied to both the September 1990 and January 1991 probations, the court would "add the additional term of incarceration to *only one* of [Baker's] first two disputed convictions." *See Flores*, 93 F.3d at 592. One of these two prior sentences would exceed 13 months, and 3 points, not 6, would be added to Baker's criminal history score. *See* U.S.S.G. § 4A1.1(a); § 4A1.2(e). Baker's criminal history category would be V, not VI, and his Guidelines range would be 262 to 327 months, not 292 to 365 months.

The government argues that plain-error review applies because Baker failed to object on the basis of the Application Note during sentencing.[19] But "it is claims that are deemed

---

[19] The government goes on to argue that any error would be harmless because Baker received a below-Guidelines sentence. A below-Guidelines sentence does not avoid or make harmless an error in the Guidelines calculation. *See United States v. Bonilla-Guizar*, 729 F.3d

waived or forfeited, not arguments." *United States v. Pallares-Galan*, 359 F.3d 1088, 1095 (9th Cir. 2004) (applying de novo, rather than plain-error, review). Although Baker argued at sentencing that the September 1990 and January 1991 sentences should be treated as a single sentence under U.S.S.G. § 4A1.2(a)(2), and on appeal that Application Note 11 meant that the single revocation triggered only a three-point increase, his argument here is "an alternative argument to support what has been his consistent claim from the beginning." *Pallares-Galan*, 359 F3d at 1095. The consistent claim is that "for the two sentences imposed on the cases reported in paragraphs 99 and 102 of the Presentence Report, only one 3 point assessment should have been made." "Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Pallares-Galan*, 359 F.3d at 1095 (quoting *Yee v. Escondido*, 503 U.S. 519, 534 (1992)).

The record does not provide an adequate basis for us to determine whether Baker's criminal history score should be increased by three rather than six points in light of Note 11 to U.S.S.G. § 4A1.2(k). The government argues that because the revised presentence report referred to the revocation sentencing as taking place on both August 21 and August 24, 1992, it was unclear whether he was sentenced for the two revocations at the same time or on two different dates. There is no requirement in either *Flores* or the § 4A1.2(k) Application Note that the underlying revocations be sentenced on the same day, and the record makes clear that there was one motion to revoke and a single revocation,

1179, 1188–89 (9th Cir. 2013); *United States v. Kilby*, 443 F.3d 1135, 1140 (9th Cir. 2006).

which occurred on August 24, 1992. Read in context, the reference in the presentence report to August 21 is likely a scrivener's error. The report's prior paragraph identifies the revocation sentence as "08/24/92: 18 mos." Two paragraphs in the presentence report refer to the sentencing in the other revocation as taking place on "08/24/92," and that "[o]n August 24, 1992, Baker admitted violating probation and the 18 month prison sentence was imposed."

It is, however, not clear that both of the probation terms imposed for Baker's prior sentences were revoked because of the "same violation conduct." Although the record shows that probation in both cases was revoked and both sentences imposed on the same day, that does not mean that both revocations resulted from the same conduct. *See* U.S.S.G. § 4A1.2(k), cmt. n.11.

Because the district court understandably did not account for Note 11 in calculating Baker's criminal history score, and because the record does not allow us to determine whether the correct score is based on a three- or a six-point increase, we vacate Baker's sentence and remand to the district court for resentencing, so that the district court can consider whether Note 11 applies, and correctly calculate the criminal history category and Guidelines sentencing range.

## IV.  Albert Greenhouse's Sentencing Appeal[20]

Greenhouse worked from his home in Florida from 2005 to 2007, soliciting investments in partnership units for *From Mexico with Love*.  His work succeeded in getting victims to send Cinamour approximately $1,340,000.  Greenhouse was indicted on one count of conspiracy under 18 U.S.C. § 371, three counts of mail fraud under 18 U.S.C. § 1341, and two counts of offering and selling (or aiding and abetting the offer and sale of) an unregistered security under 15 U.S.C. § 77e and 77x and 18 U.S.C. § 2.  He was tried and convicted on two counts of willfully engaging in the offer and sale of unregistered securities and aiding and abetting and causing those sales.  The jury acquitted him on the remaining charges. The district court calculated his Guidelines range as 63 to 78 months, including enhancements under U.S.S.G. §§ 2B1.1 and 3A1.1 for the fraud-loss amount, for the number of victims (10 or more), and for the victims' vulnerability.  The court overruled Greenhouse's objections to the enhancements.  The government recommended a 78-month sentence and an $8,981,676.68 restitution obligation, based on the total loss for all investors in both the Florida and California boiler rooms during the time Greenhouse was involved.  Greenhouse argued for a $10,000 fine and no restitution.  The district court sentenced Greenhouse to serve a below-Guidelines 60-month prison term and to pay $530,000 in restitution.

---

[20] Greenhouse did not challenge his conviction in his opening brief.  In his reply brief, he sought reversal of his conviction based on an SEC proposal to lift the Regulation D ban on general solicitations and advertising in limited certain circumstances.  At oral argument, however, Greenhouse abandoned that challenge to his conviction.  We consider only his challenge to his sentence.

We review Greenhouse's sentencing challenges to the district court's interpretation of the Sentencing Guidelines de novo, to the factual findings during sentencing for clear error, and to the application of the Sentencing Guidelines for abuse of discretion. *United States v. Lynn*, 636 F.3d 1127, 1138 (9th Cir. 2011). "The legality of an order of restitution is reviewed de novo, and factual findings supporting the order are reviewed for clear error." *United States v. Brock-Davis*, 504 F.3d 991, 996 (9th Cir. 2007) (emphasis removed). "Provided that it is within the bounds of the statutory framework, a restitution order is reviewed for abuse of discretion." *Id.*

Greenhouse first argues that the district court should not have increased the offense level based on the loss amount. Citing no authority, he argues that the district court improperly applied § 2B1.1(b) because it requires a conviction involving fraud or moral turpitude, and he was acquitted of fraud and convicted only of selling unregistered securities. Greenhouse ignores the fact that he was convicted of violating 15 U.S.C. §§ 77e and 77x, which are cross-referenced with § 2B1.1 in the Statutory Index. *See* U.S.S.G. App. A-Statutory Index; U.S.S.G. § 2B1.1, cmt. Statutory Provisions; *United States v. McEntry*, 659 F.3d 893, 897 (9th Cir. 2011) ("When deciding which guideline to apply, a district court must determine the guideline section in Chapter Two (Offense Conduct). . . . To do this, the court is to refer to the Statutory Index, Appendix A of the Guidelines, to find the offense of conviction . . . ." (citation omitted)). He also ignores the relationship between the sale of unregistered securities and the absence of disclosures about, or review of, those securities, designed to prevent and address fraudulent misrepresentations. The district court did not err in applying the 16-level enhancement under § 2B1.1(b).

Greenhouse also argues that even if § 2B1.1(b)'s loss enhancement does apply to his securities convictions, the district court erred in concluding that he caused $1,340,000 in investor losses. Greenhouse stipulated that he personally solicited $1,340,000 from victims and that they all lost everything they invested. Greenhouse argues that the failure to register the securities and the way they were marketed did not cause these losses. Instead, he asserts, the investors lost money because the movie "bombed at the box office." The district court rejected Greenhouse's argument that he was not responsible for any of the investors' losses. We review the district court's loss-causation finding for clear error. *See Miller v. Thane Int'l, Inc.*, 615 F.3d 1095, 1104 (9th Cir. 2010).

The evidence showed that the victims invested after Greenhouse made promises that their money was safely invested, with no risk of loss, and they would get a guaranteed and fast return on their investment. Greenhouse specifically promised victims that the money they invested would go to making and distributing the movie, not to paying the promoters or sales personnel. Contrary to his promises, most of the investments went to pay the telemarketers and promoters and very little went to make or distribute the movie, contributing to the box-office disaster Greenhouse identifies as the only reason for his losses and as unrelated to his acts or omissions. The evidence showed that Greenhouse sold unregistered securities when he "knew or, under the circumstances, reasonably should have known," that "pecuniary harm" was at least "a potential result." U.S.S.G. § 2B1.1, cmt. n.3(A)(iv). It was reasonably foreseeable to Greenhouse that making these misrepresentations in selling unregistered securities would cause investors to lose their money. These losses were not "caused by the intervening,

independent, and unforeseeable criminal misconduct of a third party," *United States v. Hicks*, 217 F.3d 1038, 1049 (9th Cir. 2000), or by the vagaries of the movie-watching public. The record supports the district court's conclusion that Greenhouse was a causal factor in his victims' losses and did not err in applying the loss enhancement.

Nor did the district court err in applying either the two-level increase under § 2B1.1(b)(2)(A)(i) for ten or more victims or the two-level increase under § 3A1.1(b)(1) for vulnerable victims, or in imposing $530,000 in restitution as a condition of supervised release. Greenhouse admits that he sold partnership interests in *From Mexico with Love* to ten or twelve investors who lost a total of $1,340,000. Greenhouse admits that he solicited some victims who had already invested money in *From Mexico with Love*. These victims were vulnerable under the applicable law. *Ciccone*, 219 F.3d at 1086; *Randall*, 162 F.3d at 560. Finally, the restitution amount did no more than compensate for the loss caused by the specific conduct that was the basis of Greenhouse's "offense[s] of conviction." *United States v. Batson*, 608 F3d 630, 636 (9th Cir. 2010).

We affirm Greenhouse's sentence.

## CONCLUSION

We (1) affirm Lloyd's sentence; (2) vacate Keskemety's sentence and remand for resentencing; (3) reverse Nelson's convictions, vacate his sentence, and remand; (4) affirm

Baker's convictions but vacate his sentence and remand for resentencing; and (5) affirm Greenhouse's sentence.

**AFFIRMED** in part, **REVERSED** in part, **VACATED** in part, and **REMANDED** in part.